FEDERAL DEPOSIT INSURANCE CORPORATION, a United States corporation, Plaintiff,

v.

GENERAL INVESTMENTS, INC., Defendant and Third Party Plaintiff.

Ray H. DITTMORE, Defendant and Third Party Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, a United States corporation, as Receiver of American City Bank, Third Party Defendant.

No. 78–C–234.

United States District Court,
E. D. Wisconsin.

Sept. 18, 1981.

Gregory G. Wille, Gibbs, Roper, Loots & Williams, Milwaukee, Wis., for FDIC.

John A. Busch, Michael, Best & Friedrich, Milwaukee, Wis., for General Investments, Inc.

E. Campion Kersten, Kersten & McKinnon, Milwaukee, Wis., for Dittmore.

## MEMORANDUM AND ORDER

WARREN, District Judge.

In this civil action, plaintiff Federal Deposit Insurance Company seeks payment on two promissory notes from General Investments, Inc. and Ray H. Dittmore. The first promissory note has a face amount of $135,-600.00, $47,969.69 of which allegedly remains unpaid ("the $47,969.69 note"). The second promissory note has a face amount of $511,000.00, all of which allegedly remains unpaid ("the $511,000.00 note"). FDIC, which is seeking collection in its corporate capacity pursuant to 12 U.S.C. § 1819, has moved for summary judgment. In addition, FDIC, as receiver of American City Bank (American), seeks summary judgment dismissing the third party actions filed by the defendants against it.

### I. *Background*

Before resolving the pending motions, the Court will briefly discuss the parties involved in this action and undertake a review of the events surrounding the creation of the notes in controversy.

### A. Parties involved.

Defendant Dittmore is president and principal shareholder of Universal Telephone Incorporated (UTI), a company he founded in about 1960. FDIC alleges Dittmore is liable on the two promissory notes as a guarantor.

Defendant General Investments, Inc. (GII), under a different name, was originally a subsidiary of UTI. Sometime in the late 1960's, UTI sold it to Harold Townsend, who was at that time a UTI employee. Townsend remained as president of GII until his death in March of 1978. At that time, Richard G. Froemming purchased GII and became its president. Froemming also is Dittmore's assistant at UTI. FDIC alleges GII is liable as debtor on the two promissory notes.

FDIC is not the original creditor on the two notes. The notes were entered into by GII and American in 1973 and 1974. However, on October 21, 1975, the Comptroller of the Currency declared American insolvent and terminated its powers and existence as a national banking association. Immediately thereafter, the FDIC was appointed receiver for American. On that date the receiver, pursuant to an order of this Court, entered into a contract providing for the sale of certain assets of American, including the promissory notes in question, to the FDIC, in its corporate capacity, pursuant to 12 U.S.C. § 1823.

B. The $47,969.69 note.

The origins of the $47,969.69 note date back to 1969 when a Mr. Harold Meister pledged, *inter alia*, 54,630 shares of $1.00 par value Series AA Convertible Preference Special Stock of UTI with American in order to obtain a $2,500,000.00 loan. UTI guaranteed the loan and, in addition, pledged as collateral shares of Continental Bank stock it had purchased from Meister.

On June 1, 1971, Meister satisfied his indebtedness with American by releasing to the bank certain real estate and all his rights, title and interest in the 26,747 shares of UTI AA preferred stock still held by the bank as collateral.

On January 4, 1972, GII purchased the 26,747 shares of UTI stock from American for $863,523.00. In order to purchase the stock, GII borrowed the purchase price of the stock from the bank. GII pledged the UTI stock as collateral for the loan. In addition, UTI executed a limited guarantee for the loan and pledged as collateral an $863,253.00 certificate of deposit. The note and all renewals specifically provided the dividends on the pledged stock would be applied on the loan.

On January 2, 1973, UTI paid American $546,653.00 toward satisfaction of GII's $863,253.00 indebtedness thereby reducing the amount owed to American on the first note to $316,600.00.

On June 28, 1973, GII, UTI and American entered into an agreement in which UTI's guarantee on the loan was canceled and replaced by Dittmore's personal guarantee of "the balance of GII's loan up to a maximum of $316,600.00 or balances as they may be reduced." In the agreement, GII gave Dittmore an option to buy any part or all of the UTI stock pledged to American. The agreement also stated that the dividends on the preference stock were to be paid to American to pay the interest and principal on the loan.

In October of 1973, GII reduced its indebtedness to $135,600.00 and executed a new note. Finally, in November of 1973, GII further reduced the amount outstanding to $47,969.69 and Dittmore executed a new guarantee.

C. The $511,000.00 note.

The history of the second note is nearly as convoluted as the history of the first note. In July of 1972, GII borrowed $500,-000.00 from Colonial Bank & Trust of Chicago to purchase 11,644 shares of American Bankshares Corporation stock from Dittmore. The note pertaining to this loan was executed on July 11, 1972 and was guaranteed by Dittmore.

The July, 1972, note was renewed on several occasions by Colonial before being discharged in April of 1973 with the proceeds of a new loan in a like amount from American. That note was renewed once by American. In July, 1973, the American loan was discharged by a new loan from First National Bank of Waukesha (Waukesha). In September, 1973, the Waukesha loan was discharged and replaced by a new loan from Suburban Bank and Trust Co. of Oak Park, Illinois (Suburban). In March 1973, the Suburban note was discharged by a new Colonial note. In May, 1974, the note to Colonial was purchased by American. That note was then discharged and replaced by the $511,000.00 note sued upon.

The American note purchased from Colonial was not paid at maturity on June 19, 1974. According to FDIC, American extended the note to August 19, 1974 on July 5, 1974.

The defendants contend that during a meeting on July 3, 1974, Harold Erickson, the president of American, met with Dittmore and Townsend and "stated that he [Erickson] had decided to reduce GII's indebtedness on the $511,000 [note] by approximately $400,000 and to charge no more interest on the balance, but he could not give a final figure until his internal auditors reviewed the credit and the reserves." (GII's brief in opposition to summary judgment, p. 7.) No written agreement memorializing the write-down was ever executed. In addition, in an October 13, 1975 letter to Dittmore, Townsend informed Dittmore that American City Bank would renew $547,000.00 of GII's note on a 20-year amortization level payment basis at $4,575.33 per month which included payments for interest. The letter further stated that the amount of GII's notes at American City Bank was $558,969.69. Dittmore acknowledged his agreement with Townsend's letter by signing it October 14, 1975.

D. Later Activity.

As stated earlier, American was declared insolvent on October 21, 1975. On November 11, 1975, the FDIC contacted GII requesting prompt attention to the loans. On January 21, 1976, Townsend informed James Hudson, liquidator for the FDIC, that GII would attempt to liquidate its obligations as follows:

(a) As GII receives the $4,575.33 monthly proceeds from Ray H. Dittmore on the amount he owes GII, GII will pay these proceeds on the above referenced loan.

(b) GII will work to close the sale of SSU's assets as soon as possible and upon receiving its $150,000 fee, GII will apply it on the loans referenced above.

(c) GII will approach financial institutions in an effort to refinance the balance of the loans referenced above. (Froemming affidavit, exhibit 6.)

Although it had signed no written agreement with FDIC, GII, in January of 1976, began endorsing the monthly checks for $4,575.33 it was receiving from Dittmore

over to the FDIC. The FDIC received the checks each month until March of 1978 and applied the payments to interest on both notes. After GII stopped making payments to FDIC in March of 1978, FDIC instituted this action.

II. *Motion for Summary Judgment*

Summary judgment is appropriate only if it is established that there is no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The burden is upon the moving party to show there is no issue of material fact in dispute, *Rose v. Bridgeport Brass Co.*, 487 F.2d 804, 808 (7th Cir. 1973), and all doubts as to the existence of an issue of material fact must be resolved against the movant. *Moutoux v. Gulling Auto Electric, Inc.*, 295 F.2d 573, 577 (7th Cir. 1961). In passing on a motion for summary judgment, the trial court may only determine whether or not there exists a dispute as to a material issue of fact. It is not permitted to resolve that dispute. *Carter v. Williams*, 361 F.2d 189, 194 (7th Cir. 1966).

Plaintiff has moved for summary judgment based on its contention that there is no genuine issue as to any fact relevant to the material issues raised by the pleaded defenses to liability on the notes and guarantees. It also contends that defendants' defenses are insufficient as a matter of law. The Court will examine the defenses asserted by the defendants and determine whether they raise genuine issues of material fact and whether they are legally sufficient to withstand the FDIC's motion.

A. Payment.

(1) The $47,969.69 note.

The parties agree that the $47,969.69 note would have been paid off had the FDIC applied the $4,575.33 monthly checks it received from GII between January, 1976 and March, 1978 solely to that note. FDIC, of course, did not apply the monthly payments solely to that note. Rather, it applied the

proceeds from those payments to the delinquent interest on both notes.

The defendants contend that the monthly payments, which GII made to FDIC by endorsing the checks it received from Dittmore as monthly installments due on a note from Dittmore to GII, should have been applied exclusively to the $47,969.69 note. The basis for the defendants' contention is the tri-party agreement among American, GII and Dittmore dated June 28, 1973. In that agreement, American, GII and Dittmore set forth how the $316,000.00 indebtedness (now $49,969.69) of GII would be paid. The three parties agreed that the 26,747 shares of preferred UTI stock would be pledged to that debt, that Dittmore had an option to purchase the shares from GII at a stated price in cash or by a note, and that the dividends from the stock would be paid to reduce the indebtedness. When Dittmore subsequently purchased the 26,747 shares from GII on February 19, 1974, defendants contend he was merely exercising his rights under the June 28, 1973 agreement. The defendants maintain American was aware of those rights and restructured its collateral position to reflect that the smaller GII obligation was secured by the $462,000.00 note from Dittmore to GII. Defendants also contend that FDIC knew by virtue of Townsend's letters of October 13 and December 17, 1975 that the proceeds from the $462,000.00 were to be used to retire the $47,969.00 debt. Based on their contention that FDIC knew that the source of GII's monthly payment was the 26,747 shares of stock, defendants argue that "identical property rule" should operate to extinguish the smaller note.

The FDIC disputes the defendants' contention that it was obligated to apply the $4,575.33 monthly payments solely to the smaller note. It argues that neither Dittmore nor GII ever gave the FDIC any written or oral direction that these payments were to be applied to one or the other of the GII notes; that neither Dittmore nor Froemming has personal knowledge that any such oral instruction was ever given by anyone; and that the FDIC records do not reflect receipt of any such instruction. It further argues that the October, 1973 agreement had no effect on any repayment schedule after Dittmore purchased the stock in 1974. It also contends that neither the October or December, 1975 letters direct payment on the smaller note only. Finally, it maintains that the "identical property rule" does not apply in this action because Dittmore had guaranteed both notes.

■ Having considered the parties' arguments and having reviewed the documents involved, the Court rejects the defendants' argument that the $4,575.33 monthly payments were to be applied exclusively to the smaller note. Defendants' contention that the June 28, 1973 letter agreement obligated FDIC to apply payments only to the smaller note is completely without merit. That agreement related to *GII's* obligation to apply UTI stock dividends to its debt at the bank. Once Dittmore purchased the stock, GII's obligation ceased.

Furthermore, the October 13, 1975 document signed by Dittmore indicates that Dittmore's indebtedness to GII for the purchase of the UTI stock had grown from $462,600.00 to $547,000.00 between February 19, 1974 and December 31, 1975 as the result of unpaid interest. The agreement further indicates that American would renew $547,000.00 of GII notes to it on a 20-year amortization level payment basis with Dittmore's monthly payments on *his* $547,000.00 note to GII pledged as collateral. Because those monthly payments were being pledged as collateral for the new note that was to retire both the $47,969.69 note and the $511,000.00 note, the Court rejects defendants' contention that the payments were intended only for the retirement of the smaller debt.

The December, 1975, letters from Townsend to Hudson also support the Court's conclusion. In that letter, Townsend informed Richard Alvarado of the FDIC that GII had a note in the amount of $547,000.00 from Dittmore and that "[t]he proceeds from this note can be used to pay on GII's loans at American City Bank (now FDIC)."

Finally, contrary to the defendants' assertions, the identical property rule does not apply in this action. Under the "identical property" rule, when a payment made to a creditor is known by the creditor to be derived from a particular source or fund, the creditor must apply it to the exoneration of the debt related to that source or fund, at least where the rights of third parties are concerned. *Moser Paper Company v. North Shore Publishing Company,* 83 Wis.2d 852, 858, 266 N.W.2d 411 (1977), *Sorge Ice Cream & Dairy Co. v. Wahlgren,* 28 Wis.2d 220, 223, 137 N.W.2d 118 (1965). The exception is an equitable one and is intended to ensure that payments made with the identical money or property for the payment of which a guarantor is bound are not applied to a debt other than that for which the guarantor is bound. *Id.* at 223, 137 N.W.2d 118.

Although both Dittmore and GII assert that the rule is applicable, neither defendant has identified any harm befalling Dittmore as third party guarantor. Because Dittmore is the guarantor *on both loans,* the Court must conclude that defendants' failure to identify any harms befalling Dittmore is due to the absence of any such harm. Consequently, the Court holds that the "identical property" exception is inapplicable in the case at bar, and further holds that FDIC acted properly in applying the monthly payments to both loans.

Based on the foregoing, the Court holds that the defendants' defense of payment on the $47,969.69 note is insufficient as a matter of law.

(2) The $511,000.00 note:

Although the defendants did not raise the defense of payment in their answers to plaintiff's claim on the $511,000.00, they do raise the defense in their briefs in opposition to FDIC's motion for summary judgment. This argument is based on Dittmore's affidavit allegations that on July 3, 1974, American entered into an agreement with GII and Dittmore to settle claims which GII and UTI allegedly had against American and American Bankshares arising out of the transactions between American and UTI. Based on the Dittmore affidavit, the defendants claim that American agreed to settle those claims for $500,000.00 and to write off and not enforce collection of the $511,000.00 note to that extent.

FDIC asserts two arguments in opposition to the defendants' defense of settlement. First, it argues no such agreement was ever made. Second, it argues that such an agreement would be unassertable under the parol evidence rule, 12 U.S.C. § 1823(e) and the Supreme Court's decision in *D'Oench, Duhne & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1941).

Having reviewed the affidavits and exhibits before it, the Court must reject defendants' argument that an offset was agreed upon in the July 3, 1974 meeting. In the deposition of Dittmore taken on June 21, 1979, Dittmore admitted no settlement agreement was ever actually finalized. This is borne out in his testimony at pages 169 (lines 9–12), 175 (lines 6–9) and 177 (lines 3–13) of his deposition:

A. July 3, 1974, and Pete Erickson said, "All right. Here is my position. I will get you a settlement within about sixty days in writing. Maybe I can get it done in two or three weeks. . . ."

* * * * * *

A. . . . he [Erickson] said, "I will tell you, it's going to be two weeks or more before I can get at finishing this thing up and getting it in writing. . . ."

* * * * * *

Q. In fact, the bank was in existence for, in addition to sixty days beyond that?

A. Oh, yeah. Another year.

Q. Year, year and a half?

A. Year and three months. It went on quite a ways, but it had been in the newspapers.

Q. But you never got that agreement, that settlement?

A. No, because just about the time he should have been writing it, the new group was taking over. They took over the place. Then I started meeting with

them. Well, months and weeks slipped by.

Further documentation showing that no agreement was ever reached is found in the letters of October 28, 1975 and December 13, 1975 where GII acknowledged that the total amount owed to American was $558,-969.69 ($511,000.00 plus $47,969.69).

Assuming, arguendo, the parties had reached a set-off agreement during the July 3, 1974 meeting, the Court nonetheless would hold such an agreement invalid. It is undisputed that the specifications of the agreement were not written nor approved by the bank's board of directors or loan committee. Section 1823(e) precludes such an agreement. That section states:

> No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

This section allows the FDIC, when it has purchased assets in its corporate capacity, to disregard oral agreements which would diminish or defeat its interest in any asset so purchased. *FDIC v. Vogel*, 437 F.Supp. 660 (E.D.Wis.1977), *Dasco, Inc. v. American City Bank & Trust Co.*, 429 F.Supp. 767 (D.Nev.1977).

Notwithstanding the language of § 1823 and the lack of any written document formalizing the terms of the agreement purported reached on July 3, 1974, the defendants contend the agreement is valid. They argue that no additional written agreement was necessary because the promissory note executed on June 19, 1974 contained the following language:

> In case of the insolvency of the undersigned (GII), any indebtedness due from the legal holder hereof to the undersigned may be appropriated and applied hereon.

Based on this language and Froemming's assertion that GII was insolvent on July 3, 1974 (Froemming affidavit, p. 2), defendants argue the discussions of July 3, 1974 were in the nature of an appropriation rather than an agreement.

■ The Court does not agree. Nothing in the record before the Court supports defendants' naked assertion that American's alleged actions were in the nature of an appropriation rather than an agreement.

Based on the foregoing, the Court holds that the defendants' defense of payment on the $511,000.00 note is insufficient as a matter of law.

### B. Consideration.

A second affirmative defense raised by Dittmore with respect to the $511,000.00 note is lack of consideration. Although he acknowledges that the $511,000.00 note between GII and American was originally supported by consideration, Dittmore contends he is not liable for the amount outstanding on that note because the note and guarantee were not executed simultaneously and because he received no consideration, other than the alleged loan write-down, when he guaranteed the note on July 3, 1974. It is Dittmore's contention that a guarantor's promise must be supported by consideration distinct from that supporting the principal debt when a guarantee agreement is made separately from the transaction creating the principal.

FDIC disputes Dittmore's contention that the note and guarantee were executed on different days. Although the $511,000.00 note bears the date June 19, 1974 and Dittmore's guarantee bears the date July 3, 1974, FDIC argues that all admissible evidence in the record establishes that the renewal of the GII note was not agreed to until July 3, 1974 and was not actually accomplished until July 5, 1974.

■ Because the note itself bears the date June 19, 1974 and is admissible into evidence, the Court must reject FDIC's contention that there is no genuine issue as to the date the loan was renewed. Resolving all doubts as to the existence of an issue of material fact against the movant, the Court is of the opinion that the June 19, 1974 document raises the inference that the parties renewed the note on that date. Although the FDIC sets forth very persuasive arguments to rebut this inference, those arguments go to the weight to be given to the June 19, 1974 note and not to its admissibility.

In rejecting FDIC's contention that there is no genuine issue as to the timing of the guarantee, the Court does not, of course, foreclose the FDIC from raising any legal arguments regarding Dittmore's guarantee. The Court only rejects FDIC's contention that no genuine issue exists with respect to the date the loan was renewed.

### C. Extent of Guarantee.

Another argument Dittmore raises relates to the extent of his guarantee on the smaller note. He maintains that he guaranteed only the principal amount loaned by the bank on that note. Consequently, he argues that in the event he is found liable on the note, recovery should be limited to principal and should not include past due interest.

The guarantee signed by Dittmore is a printed guarantee which contains the following language:

In consideration of One and no/100 Dollars ($1.00) to Ray H. Dittmore, the undersigned, in hand paid by AMERICAN CITY BANK & TRUST COMPANY, MILWAUKEE, WIS., and other good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned hereby promises and agrees to pay or cause to be paid to AMERICAN CITY BANK & TRUST COMPANY, MILWAUKEE, WIS., its successors or assigns, the certain promissory note dated October 3, 1973 executed by General Investments, Inc., and payable to AMERICAN CITY BANK & TRUST COMPANY, MILWAUKEE, WIS., of Milwaukee or order one year after date, with interest at N. Prime per cent per annum, or any renewal or renewals of the whole or any part of said note.

In addition to the above language, the note contains the following typed sentence below Dittmore's signature:

Notwithstanding anything herein above to the contrary, the indebtedness, obligations & Liabilities of the Debtor which are guaranteed by Ray H. Dittmore herein are limited to loans of the Bank to the Debtor in the amount of $47,969.69.

FDIC argues that the typed sentence does not limit Dittmore's liability to principal but merely serves to further identify the specific loan being guaranteed. It contends that Dittmore and American could easily have used language directly stating that the guarantee did not cover interest or stating flatly that Dittmore's liability was limited to $47,969.69 if they had wanted to place a limitation on Dittmore's liability.

Dittmore argues that the typed sentence does limit his liability to the principal amount of the loan. He contends that no language was needed to limit the guarantee to this particular loan because the guarantee was already so limited. He further contends that the language was not needed to specify which loan was being guaranteed because this was the only loan GII had at American at that time. Finally, Dittmore contends the guarantee is ambiguous and, therefore, should be construed in his favor.

■ The Court agrees with Dittmore that the guarantee is ambiguous. Had American and Dittmore intended to limit Dittmore's guarantee to principal only, they could certainly have used clearer language to do so. On the other hand, had American and Dittmore intended to limit the guarantee to the loan in question, they would not have needed the additional language because the printed language already so limited the loan.

Aside from the ambiguity of the language, the Court rejects FDIC's position for

another reason. The $47,969.69 loan in question is the reduced balance of what was formerly the $316,000.00 debt. In the June 28, 1973 agreement among UTI, GII and American, Dittmore agreed to guarantee the debt. That agreement states:

> 2. Ray H. Dittmore will guarantee this balance to a maximum of $316,000 or balances as they may be reduced . . .

Because Dittmore's guarantee of that loan did not include interest, it is reasonable to infer that Dittmore intended to guarantee only the principal of the $47,969.69 note also.

Based on the foregoing, the Court rejects FDIC's contention that, as a matter of law, this Court must find that Dittmore's guarantee covered both principal and interest on the $47,969.69 note.

### III. *Third Party Complaint*

#### A. Dittmore.

In his third party complaint, Dittmore seeks contribution from FDIC in its receiver capacity. He alleges that the $511,000 note and guarantee were obtained by American by means of: false and fraudulent representations as to the value of the shares of American Bankshares; breach by officers of American and American Bankshares of their duty to disclose the true financial condition of the bank; and false and misleading financial information issued by American and American Bankshares as to their financial condition. Dittmore claims to have relied on each of these alleged misrepresentations in executing and delivering the guarantee in question. He also contends that he gave the guarantee only upon the express understanding and agreement that the obligation represented by the note was to be cancelled or substantially cancelled as part of the settlement of GII's and Dittmore's claims against American. Dittmore contends that FDIC as receiver of American is liable *pro tanto* for contribution if the plaintiff FDIC as assignee of the notes and guarantees obtains any judgment against him.

The Receiver contends that Dittmore is not legally entitled to contribution against it because contribution is a right giving one joint tortfeasor or joint obligor the right to proceed against another joint tortfeasor or joint obligor to pay his proportionate share of the joint liability. Because Dittmore and the FDIC share no common liability, FDIC argues that the facts of this case cannot support a claim for contribution.

 The Receiver's argument is persuasive. Dittmore has set forth no theory by which he and the receiver would be jointly liable. Furthermore, because the Court has previously held that no settlement actually occurred and because Dittmore has not offered any evidence or arguments to rebut the FDIC's contention that no fraud ever occurred, the Court finds no genuine issue as to any material fact alleged in Dittmore's third party complaint and holds the Receiver is entitled to judgment as a matter of law. Accordingly, the Receiver's motion dismissing Dittmore's third party complaint against it is hereby granted.

#### B. GII.

In its third party complaint, GII seeks contribution and/or indemnity from FDIC in its receiver capacity. Its third-party complaint sets forth six causes of action. The first five causes of action pertain to GII's claims of fraud. In its response to the Receiver's motion for summary judgment, GII states that it has not uncovered any written evidence of deceit. Therefore, it has agreed to dismissal of its first five causes of action against the Receiver.

In its sixth cause of action, GII alleges GII and American entered into a compromise settlement agreement regarding the $511,000.00, under the terms of which the obligation represented by the note was to be cancelled or substantially cancelled as part of the settlement of GII's claims against American and American Bankshares.

 The Court has previously rejected GII's contention that any settlement agreement was ever reached. Furthermore, had such a secret agreement been entered, the Court would hold such an agreement inad-

missible under the parol evidence rule. The Court would also hold such a secret agreement invalid pursuant to the public policy against schemes to create a false appearance of bank assets. *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447 (1941).

Based on the foregoing, the Receiver's motion for summary judgment dismissing GII's claims against it must be and is hereby granted.

### IV. *Interest*

Finally, GII contends summary judgment is inappropriate because there is a dispute over the amount of interest due. It contends a genuine issue as to how the interest on the large note was computed exists and has not been clarified by the FDIC. It does not, however, specifically point to any error in calculations in Mr. Kissel's second computation.

The Court rejects GII's contention that a genuine issue exists as to the interest due. There is no dispute over FDIC's admission that Mr. Alvarado merely committed a clerical error when he failed to include in his interest calculations the amount of interest charged off from American's operating statements and carried on a separate ledger.

### V. *Summary*

In summary, the Court hereby orders:

1. plaintiff's motion for summary judgment on its claims against GII be and hereby is granted;

2. plaintiff's motion for summary judgment against Dittmore on the principal amount of the $47,969.69 note be and hereby is granted;

3. plaintiff's motion or summary judgment against Dittmore on the interest of the $47,969.69 note be and hereby is denied;

4. plaintiff's motion for summary judgment against Dittmore on the $511,000.00 note be and hereby is denied;

5. the third party's motion for summary judgment dismissing Dittmore's and GII's claims against it be and hereby is granted; and

6. the parties to appear before the Court for a status report conference at *1:30 p. m. on Wednesday, October 7, 1981.*