In the Matter of Wayne A.
RICHARDSON and Jane
L. Richardson, Debtors.

Albert L. JOHNSON and Juan
Johnson, Plaintiffs,

v.

Wayne A. RICHARDSON and Jane L.
Richardson, Defendants.

Adv. No. 84–0099–7.

United States Bankruptcy Court,
W.D. Wisconsin.

Feb. 14, 1985.

Linda D. Taplick, Murphy & Desmond, S.C., Madison, Wis., for plaintiffs.

Donald E. Carroll, Schuster & Carroll, Madison, Wis., for defendants.

MEMORANDUM DECISION
AND ORDER

ROBERT D. MARTIN, Bankruptcy Judge.

This is an adversary proceeding in a chapter 7 case brought to obtain possession of a 1971 Ford 9000 tractor ("the tractor") in the possession of the defendant/debtor. The plaintiffs ("Johnsons") own a 350 acre farm in Sauk County on which the defendants ("Richardsons") lived and worked for the 1983 crop year. The Johnsons owned the livestock and feed, and the Richardsons grew crops and cared for the livestock. Profits from the farming operations were to be shared 60/40.

On January 19, 1983, the Richardsons made a deposit of $100.00 on the tractor which they hoped to purchase from Simpson's Ford Tractor of Richland Center ("Simpson's"). The purchase was contingent upon the availability of financing. On February 18, 1983, after learning of Ford Motor Credit Company's ("FMCC") acceptance of their credit application, the Richardsons paid Simpson's $500.00 on account

for the down payment on the tractor. They paid another $500.00 on account toward the down payment on March 2, 1983. The Richardsons and FMCC apparently entered into a retail installment contract in very early March of 1983. That undated contract provided for a cash down payment of $2,508.00 and a $7,000.00 balance to be financed at 14.5% annual interest.

At some time in early or mid March, the Johnsons and the Richardsons met and agreed to consolidate the Richardsons' loan for the tractor with a loan of additional money to purchase various other farm machinery. On March 17, 1983, Mr. Johnson gave a $900.00 check to Simpsons Ford Tractor which was put on Richardsons' down payment account. A sales invoice was issued to Wayne Richardson on that date, and the Richardsons took possession of the tractor at around the same time. A down payment of $500.00 remained unpaid.

As evidence of their loan agreement with the Johnsons, the Richardsons delivered an Agricultural Universal Note on April 1, 1983, in the amount of $17,100.00, at an annual interest rate of 15%. To secure the debt, the Richardsons delivered an Agricultural Chattel Security Agreement ("the security agreement") granting the Johnsons a security interest in the tractor, as well as in the following items:

1982 Badger Manure Spreader

710 International 5, 18 plow

1240 John Deere plateless corn planter

Ford Manure Loader

After receiving the note and security agreement, the Johnsons gave the Richardsons a check for $1,939.25 on April 4, 1983. Of that sum, $1,200.00 was used to purchase the manure loader which was given as security. Mr. Richardson testified that approximately $725.00 of the remaining money was used to pay his 1982 income taxes. The Johnsons testified that they were unaware of the back tax bill, and believed the money was used towards payment for the tractor. In addition, the Johnsons gave a check of $7,092.45 to FMCC on May 5, 1983, to pay the balance due under Richardsons' contract with FMCC. On July 22, 1983, the Johnsons paid the remaining $500.00 of the cash down payment to Simpson's. The Johnsons perfected the security agreement by filing with the Sauk County Register of Deeds on August 2, 1983.

Monthly payments under the note were made by a milk check assignment. The Johnsons received $500.00 per month from May through October, 1983. Then on November 1, 1983, the Richardsons were evicted from the property. Nonetheless, they gave a $250.00 check to the Johnsons that month. The Richardsons made no further payments to the Johnsons.

The Richardsons filed their bankruptcy petition on December 28, 1983. Their bankruptcy trustee has abandoned all of the property listed on the security agreement.

The Johnsons estimate the fair market value of the tractor to be $7,000.00; the Richardsons estimate a fair market value of $6,000.00. The undisputed fair market value of the other four items of collateral is approximately $5,150.00. The Johnsons are in possession of those four items of collateral, and the Richardsons have possession of the tractor at this time. The Richardsons have listed the tractor on their amended schedule as exempt property under section 522(d)(1) and (5) of the Bankruptcy Code. They contend that the Johnsons' lien impairs their exemption and is therefore avoidable under section 522(f)(2)(B). The Johnsons challenge the avoidance of the lien on the grounds that they possess a purchase money security interest in the tractor and that the tractor does not qualify as a tool of the debtors' trade. Paragraph 2(b) of the security agreement states that "[c]ollateral specifically described above and not now owned by Debtor is being acquired by Debtor with proceeds of a loan from Secured Party." Both parties are in agreement as to the purchase money character of the security interest granted in the four items of collateral listed on the security agreement other than the tractor.

*Purchase Money Security Interests.*

The Richardsons seek to avoid the fixing of a lien on the tractor under section 522(f)(2)(B) of the Bankruptcy Code. That provision states:

(f) Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—

. . . .

(2) a nonpossessory, nonpurchase money security interest in any—

. . . .

(B) implements, professional books, or tools of the trade of the debtor or the trade of a dependent of the debtor.

Thus, in order for the Richardsons to avoid the Johnsons' lien on the tractor it must be a nonpossessory, nonpurchase money lien. The tractor must also qualify as a tool of the Richardsons' trade. As the tractor is now in the possession of the Richardsons, the first question clearly is whether the Johnsons have a purchase money security interest (PMSI) in the tractor. The Bankruptcy Code does not define a PMSI. In numerous decisions turning on the definition of the PMSI courts have relied on the U.C.C. definition found in U.C.C. § 9–107. The Wisconsin version of the definition, found in WIS.STAT. § 409.107 states:

A security interest is a 'purchase money security interest' to the extent that it is:

(1) Taken or retained by the seller of the collateral to secure all or part of its price; or

(2) Taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used.

Few of the cases have considered fact patterns similar to this case. In *Thet Mah & Associates, Inc. v. First Bank of North Dakota (NA), Minot*, 336 N.W.2d 134, 36 U.C.C.Rep.Ser. 649 (N.D.Court 1983), an appeal of an action brought to determine priority of conflicting security interests in restaurant equipment, the North Dakota Supreme Court ruled that both the seller of the equipment ("General Fixture") and the lender/bank ("First Bank") had PMSI's. First Bank had entered into a loan commitment with Dakota Square Restaurants Incorporated ("Dakota Square") on January 22, 1980. On March 7, 1980, First Bank and Dakota Square executed a security agreement covering all equipment and other items, now existing or thereafter acquired. Then on March 28, 1980, Dakota Square entered into a contract and security agreement with General Fixture for the purchase of some restaurant equipment. Several days later, General Fixture requested a letter for commitment of funds from First Bank. First Bank's reply stated that they had consented to a dollar amount loan for all phases of the restaurant—including equipment. On July 17, 1980, General Fixture delivered the equipment to Dakota Square and Dakota Square specifically authorized First Bank to hold $45,000.00 of the funds committed by First Bank for direct payment to General Fixture. First Bank wrote General Fixture on July 18, 1980, certifying that First Bank had committed the $45,000.00 for the equipment. The money was then paid to General Fixture on September 29, 1980.

The district court held that both parties had a PMSI in the equipment, and that First Bank had priority because it was the first to file. General Fixture appealed and contended, among other things, that First Bank did not have a PMSI because First Bank did not give value until September 29, 1980, well after Dakota Square had acquired rights in or the use of the collateral. The North Dakota Supreme Court looked to the definition of value given in U.C.C. § 1–201(44)(a) and (d) which are stated in section 401.201(44)(a), WIS.STAT. as:

a person gives 'value' for rights if he acquires them:

(a) In return for a binding commitment to extend credit or for the extension of immediately available credit whether or not drawn upon . . .

. . . .

(d) Generally, in return for any consideration sufficient to support a simple contract.

and held that First Bank incurred an obligation, the binding commitment to pay loan proceeds, which satisfied the value requirement for a PMSI when Dakota Square accepted First Bank's commitment on January 22, 1980. The court went on to hold that the course of dealing reflected in the record, indicated that that commitment was relied upon by all three parties in their actions involving the equipment purchase. Thus, First Bank had satisfied all requirements for a PMSI under U.C.C. § 9–107.

In a case with similar facts, *United States v. Cahall Bros.*, 674 F.2d 578 (6th Cir.1982), the Sixth Circuit Court of Appeals held that prior to the execution of a security agreement between the debtor and the seller of farm equipment FHA may have given the debtor a binding loan commitment sufficient to satisfy the value requirements of Ohio's version of U.C.C. § 9–107(b). The record was insufficient to support any conclusive findings and the case was remanded.

These cases are readily distinguished from the case at hand. In both *Thet Mah* and *Cahall* the record could support a finding that the nonseller lender had given value prior to the time that the debtor acquired rights in the collateral. When that is done a finding that the lender enabled the debtor to acquire rights in the property is possible. The record in the instant case does not appear to support such a finding. The earliest it could be found that the Johnsons made a binding agreement to finance the purchase of the tractor is about March 17, 1983. The testimony does not indicate that it could have been much before that date, and the Johnsons' payment of $9,000.00 on the Richardsons' down payment account at Simpson's is the first concrete evidence of an intent to commit himself to such an agreement.

However, Mr. Richardson testified that he learned of FMCC's acceptance of his credit application for the balance of the price of the tractor, excluding the cash down payment, within a month of putting down a $100.00 deposit to hold the tractor at Simpson's. Defendants' exhibits number 4, a $500.00 check from the Richardsons to Simpson's for down payment dated February 18, 1983, and number 5, a $500.00 check from the Richardsons to Simpson's for a down payment dated March 2, 1983, support Mr. Richardson's testimony.

In addition, Mr. Richardson testified that the FMCC retail installment contract was executed in very early March of 1983. While that contract is undated, no evidence to the contrary appears in the record. The question then becomes whether the Richardsons had acquired rights in the tractor pursuant to FMCC's binding commitment to finance, and prior to the Johnsons' binding commitment to finance. The testimony indicates that the Richardsons took possession of the tractor sometime soon after March 17, 1983. It conceivably could be argued that the Richardsons had not acquired rights in the tractor prior to its delivery, and then that the value given by the Richardsons on March 17 had enabled the Richardsons to acquire the use of the tractor. That argument hinges upon whether payment of the cash down payment to Simpson's was a prerequisite to the Richardsons acquiring use of the tractor. While it is true that the tractor was not delivered to the Richardsons until after the Johnsons paid $900.00 on the down payment account, there is little to indicate that this was a prerequisite. In fact, the entire down payment was not paid until July 22, 1983. Furthermore, nothing in the FMCC contract conditions the financing upon payment of the cash down payment.

Finally, Simpson's invoice, issued to Mr. Richardson on March 17, 1983, specifically indicates a $9,500.00 purchase price broken down into a $2,500.00 down payment and a balance of $7,000.00 "on FMCC contract." (Defendants' exhibit number 2.) In *Thet Mah* the court emphasized that the course of dealings between all the parties evidenced by letters, indicated that First Bank's financing agreement had been relied upon in structuring the transactions

which led to Dakota Square acquiring possession of the equipment. But nothing in the record of this case indicates that Simpson's or FMCC relied in any way upon the Johnsons' agreement to advance money to the Richardsons. Thus, it cannot be said, without indulging in speculation, that the Johnsons gave value which enabled the Richardsons to acquire rights in the tractor.

*Refinancing Agreements.*

The only reasonable inferences that can be drawn from the evidence of trial indicate that FMCC had a PMSI in the tractor to the extent of the purchase price less the cash down payment. Many cases decided under 11 U.S.C. § 522(f) consider whether a party who refinances a purchase money loan takes a security interest with purchase money character. While it is clear that FMCC gave up all security interest in the tractor when the Johnsons made full payment on May 2, 1983, it may not be as clear that the Johnsons did not acquire the PMSI from FMCC.

■ Several recent cases have discussed refinancing agreements under which a new loan is made to the debtor, and the original purchase money collateral is retained by the lender as total or partial security. Typically the first note is paid off with funds from the second note and the first note is cancelled. At least one court has held that *any* financing which terminates the initial loan also results in an unrevivable termination of the PMSI. This is because the new loan was not made to enable the debtor to acquire rights in the collateral, but is used to pay an antecedent debt. *In Re Conn,* 16 B.R. 454 (Bankr.W.D.Ky.1982) citing (but not concurring in) *In Re Jones,* 5 B.R. 655, 6 B.C.D. 848 (Bankr.M.D.N.C.1980). Courts have generally been willing to look beyond the formal notion of refinancing articulated in *Jones* and consider the substance of the questioned transactions. The refinancing agreements have thus been characterized as either renewals of the original note or as novations. The degree to which the original obligation of the debtor has changed determines whether refi-

nancing constitutes a renewal or a novation. Where a novation is found, the PMSI is extinguished. *In Re Gayhart,* 33 B.R. 699, 11 B.C.D. 1353 (Bankr.N.D.Ill.1983), *In Re Russell,* 29 B.R. 270 (Bankr.W.D.Okla. 1983). Courts vary on how substantial the degree of change must be to establish that a novation has taken place.

Some courts have made a comparison of the interest rates and payment schedules for evidence of an intent to make a novation. The court in *In Re Matthews,* 724 F.2d 798, 11 B.C.D. 938 (9th Cir.1984), held that since the lender/bank could have chosen to simply extend the old note over a longer period of time, the execution of a new note—marking the old one "paid"—evidenced the intent to satisfy the antecedent debt, creating a new agreement, and extinguishing the purchase money character of the security interest. The *Gayhart* court, however, found it ironic that a lender attempting to do a favor for the debtor by reducing interest or payments, should be penalized by losing its PMSI. The *Gayhart* court held:

'A new note given in lieu of an existing note *between the same parties* and for the same indebtedness, even at a higher rate of interest and due at a later date, is not given for a new consideration, and, therefore, does not constitute a novation.'

33 B.R. 699, 11 B.C.D. at 1354 (emphasis added) (footnote omitted), quoting *First Nat. Bank & Trust Co. v. Daniel,* 701 F.2d 141 (11th Cir.1983).

Although no court has yet considered, except in dicta, whether a renewal can be found when the parties have been changed, it appears to be generally accepted that a renewal may be found only where the same parties to the old note enter into the new note. In *In Re Mulcahy,* 3 B.R. 454 (Bankr.S.D.Ind.1980), the court noted that, had the debtors borrowed money from a third party to pay off the holder of a PMSI in the collateral, the effect would certainly be to extinguish the PMSI. By analogy, the court then held against the purchase money secured lender who had refinanced

the note, stating that they found no difference from the rule against adding new parties simply because the lender had transferred money from one pocket to another. 3 B.R. at 456. In disagreeing with this result, the *Conn* court found "the transfer from one pocket to another to be wholly permissible, so long as both pockets belong *to the same creditor.*" 16 B.R. at 460 (emphasis added).

"Looking at whether the original value has in fact been 'paid' should be the distinguishing factor." *Russell,* 29 B.R. at 274, citing *In Re Slay,* 8 B.R. 355 (Bankr.E.D. Tenn.1980). Where the original lender advances new money to the debtor which is applied to the balance of the first note, the lender has really never been paid at all. The balance is merely absorbed into the refinancing loan. *Conn,* 16 B.R. at 459.

■ However, where a third party, such as the Johnsons, advances money to the debtor which is applied to the balance of the original note, the original lender is paid off and completely drops from the picture, as did FMCC in this case. The effect then, is to create a novation rather than a renewal of the original obligation, and the PMSI is extinguished. No court has yet ruled otherwise. The result of ruling that a novation does not extinguish a PMSI would be to allow debtors to give perpetual PMSI's in previously acquired property to any party advancing new money which is used to pay antecedent debts. This is clearly against the policy of article 9 (*see* comment 2 to U.C.C. § 9–107) and 11 U.S.C. 522(f).

*Lien Avoidance.*

The Richardsons filed a voluntary joint petition under chapter 7 of the Bankruptcy Code. Section 522 lists the exemptions available to debtors under federal law, and provides that: "[t]his section shall apply separately with respect to each debtor in a joint case." Section 522(m) (amended 1984). Excluding the tractor now in contention, the Richardsons have listed $11,-160.00, or $5,580.00 each, in exempt value in property they claim to own jointly and

seek to exempt under section 522(d)(1). Section 522(d)(5) (amended 1984) states:

(d) The following property may be exempted under subsection (b)(1) of this section:

(1) The debtor's aggregate interest, not to exceed $7,500 in value, in real property or personal property that the debtor or a dependent of the debtor uses as a residence. . . .

 . . . .

(5) The debtor's aggregate interest, not to exceed in value $400 plus any unused amount of the exemption provided under paragraph (1) of the subsection, in any property.

This is the so-called "wild card" provision of section 522 which allows each debtor who does not claim homestead to exempt his aggregate interest in up to $7,900.00 in value in any property. Except as a part of this proceeding the Richardsons' exemptions have not been contested.

The Richardsons scheduled the tractor valued at $5,680.00 as jointly held and exempted under section 522(d)(6) and the "wild card" provision (5) and (1). Section 522(d)(6) provides an exemption for "[t]he debtor's aggregate interest, not to exceed $750 in value, in any implements, professional books, or tools of the trade of the debtor or the trade of a dependent of the debtor."

■ For purposes of lien avoidance, section 522(f)(2)(B) requires that a nonpossessory, nonpurchase money interest be in an implement of the trade of the debtor or his dependents. The Johnsons admit in their proposed findings of fact and conclusions of law, at number 24, that the tractor is an implement of farming, but propose that it be found not subject to lien avoidance because it has not been used by the Richardsons at any time in 1984. The general rule is that, on the date of the petition the debtor must be engaged in the trade to which the tool belongs, in order to claim the tools as exempt. *In Re Johnson,* 19 B.R. 371, 374 (Bankr.D.Kan.1982). "However, when the debtor has only temporarily

 

ceased the vocation at the time of the petition, the tools of the trade may still be exemptable." 19 B.R. at 374, 375 citing *In Re Hahn,* 5 B.R. 242 (Bankr.S.D.Iowa 1980).

In both the *Hahn* case and a later decision, *In Re Pommerer,* 10 B.R. 935 (Bankr. D.Minn.1981), the courts afforded great weight to the debtors' stated intentions to return to farming, requiring that abandonment of the trade by intentional abandonment. The *Pommerer* court stated "[i]t is not for this Court to judge the wisdom, or even the feasibility, of defendants attempting to resume farming." 10 B.R. at 942.

The court in *Johnson,* required the debtors to demonstrate any reasonable prospects for resuming pig farming. The court found the prospects to which the debtor has testified to be too indefinite, because foreclosure on the debtors' farm was imminent. The debtors had no cash or credit and their prospects for financing were too uncertain. The court denied the application for lien avoidance. 19 B.R. at 375.

The Richardsons were evicted from the Johnsons' farm on November 1, 1983. Mr. Richardson has testified that he is now employed at Schoepps Ice Cream where he intends to stay, but that he would rather be farming. In 1984 he did put up hay on a custom basis using other tractors which he owns. He testified that he plans to return to farming in the future, first part-time and then full-time. The Richardsons currently own no real estate. As in the *Hahn* and *Pommerer* cases, the circumstances of this case might support a more lenient finding in the Richardsons' favor as their inability to farm at present could be unintentional. A recent opinion of the district court for this district *In Re Nowak,* 48 B.R. 290 (W.D.Wis.1984), displays a more restrictive view of exemptions under section 522(d) for purposes of lien avoidance under section 522(f)(2)(B). While that decision is limited to treatment of automobiles as tools of the trade, that court found it particularly important that the more restrictive interpretation of exemptions under section 522(d) be applied.

 Thus, a limited view of the available exemptions is compelled and appropriate where the more expansive treatment would allow a complete avoidance of a nonpossessory, nonpurchase money security interest by virtue of section 522(f). In light of the *Nowak* decision, the *Johnson* analysis appears best suited for determining whether a tractor may qualify as a tool of the trade for purposes of lien avoidance. As the Richardsons have failed to demonstrate any reasonable prospects for re-engaging in farm operations, they may not avoid the Johnsons' lien on the tractor.

Upon the foregoing which constitute my findings of fact and conclusions of law in this case, it is hereby

ORDERED that the plaintiffs may have judgment in accordance with the demand of their complaint for possession of the 1971 Ford 9000 tractor which is the subject of this proceeding.