**In the Matter of James WEINBRENNER, Morris Swenson, Debtors.**

**Bankruptcy Nos. MM7–84–00110, MM7–84–00111.**

United States Bankruptcy Court, W.D. Wisconsin.

Aug. 28, 1985.

James Siehr, Madison, Wis., for debtors.

Robert Brill, Aulik, Brill & Eustice, S.C., Sun Prairie, Wis., for PCA.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Bankruptcy Judge.

James Weinbrenner ("Weinbrenner") and Morris Swenson ("Swenson") are partners engaged primarily in cash cropping. In 1984, they earned $7/8$'s of their $16,000.00 net income through farming operations and $1/8$ through machinery repair. They have more experience in machinery repair than cash cropping, but neither had any formal training in either trade.

Weinbrenner and Swenson each filed a chapter 13 petition on January 19, 1984. The cases were consolidated on February 7, 1984. After a hearing on the third amended chapter 13 plan, the cases were ordered dismissed or converted to chapter 7. The consolidated cases have proceeded under chapter 7 since September 4, 1984.

Weinbrenner's amended schedule of exempt property lists $750.00 "tools of trade" under the section 522(d)(6) exemption of the Bankruptcy Code. Also claimed as exempt under the "wild card" exemption of section 522(d)(5) are:

| ITEM | DEBTOR'S VALUE |
|---|---|
| 2 guns | $ 100.00 |
| cash | 25.00 |
| shop equipment | 1,000.00 |
| four section drag | 1,100.00 |
| corn planter, IHC | 875.00 |
| hay bailer, JD number 336 | 2,500.00 |
| mower-conditioner | 1,500.00 |
| elevator | 800.00 |
| TOTAL | $7,900.00 |

Swenson's amended schedule of exempt property lists $750.00 as "tools of trade" exempt under section 522(d)(6). Also claimed as exempt under the "wild card" exemption of section 522(d)(5) are:

| ITEM | DEBTOR'S VALUE |
|---|---|
| 2 guns | $ 100.00 |
| cash | 25.00 |
| shop equipment | 1,000.00 |
| tractor, JD4010 | 3,075.00 |
| four gravity boxes, J and M | 1,400.00 |
| two wagons, New Holland | 700.00 |
| side rake, New Holland | 1,000.00 |
| three wood thrower boxes | 600.00 |
| TOTAL | $8,300.00[1] |

522(f)(2). At the hearing, all parties introduced appraisals of the values of the farm equipment. The debtors' appraisal by Jerry Miller represents Miller's estimate of the fair auction price of each item. Miller is a salesman of used farm machinery with fifteen years experience, employed by McFarlane Implement, an independent dealer which sells new New Holland among other lines of equipment. McFarlane Implement does not sell John Deere equipment. PCA's appraisal by Mike McNall represents his estimate of dealer resale price. McNall is a John Deere ("JD") dealer with twenty-six years experience in the implement business. The appraised values of the items claimed as exempt and the values hereby found by the court for the purposes of this contested matter are as follows:

Production Credit Association ("PCA") contests the exemptions and claims a perfected security interest in all the farm machinery and shop equipment of each of the debtors. Additionally, PCA claims a perfected security interest in the "tools of trade" claimed as exempt.

A hearing was held before the court on January 15, 1985 to determine whether PCA's lien could be avoided under section

| ITEM | MILLER APPRAISAL AT AUCTION | McNALL APPRAISAL AT DEALER'S RESALE | COURT DETERMINED VALUE |
|---|---|---|---|
| four section drag, McFarlane | $ 250.00 | $ 400–500.00 | $ 250.00 |
| corn planter, IHC400 | 1,000.00 | 500.00[2] | 500.00 |
| hay bailer, JD | 2,700.00 | 4,800.00 | 4,000.00 |
| mower-conditioner, JD1209 | 1,200.00 | 2,000.00 | 1,500.00 |
| elevator, Kewaunee 50′ | 900.00 | 1,800.00 | 1,350.00 |
| TOTAL, Weinbrenner | $6,150.00 | $10,200–10,300.00 | $7,600.00 |
| tractor JD4010 | $2,000.00 | $ 2,700.00 | $2,300.00 |
| four gravity boxes, J & M | 1,200.00 | 1,600.00 | 1,400.00 |
| two wagons, New Holland | 600.00 | 800.00 | 600.00 |
| side rake, New Holland | 875.00 | 1,500.00 | 875.00 |
| three wood thrower boxes | 450.00 | 700.00 | 550.00 |
| TOTAL, Swenson | $5,500.00 | $ 7,300.00 | $5,725.00 |

Evidence was also introduced that Swenson owned and claimed an International Harvestor 14′ wheel disc, an eight ton Kory wagon, and running gear for the three wagons. This court and the creditors first had notice of these exemptions when Swenson filed his proposed findings of fact one day prior to the hearing. None of these items were specifically included in Swenson's schedule of exempt property. Miller and McNall gave the following valuations:

| ITEM | MILLER'S APPRAISAL | McNALL'S APPRAISAL |
|---|---|---|
| wheel disc | $900.00 | $1,400.00 |
| eight T Kory wagons | 250.00 | 350.00 |
| running gear | 850.00 | — |

1. The total wild card exemption available to each debtor under section 522(d)(5) of the 1979 Bankruptcy Code is $7,900.00, since neither debtor claims exemption for a residence.

2. McNall testified that the corn planter had a badly bent wheel which significantly impairs its value.

**574**

Swenson and Weinbrenner together claim exemption for $3,500 in value of shop equipment and tools used in their unincorporated farm machinery repair service. They introduced an appraisal through Miller who stated that he had a general familiarity with shop tools but had never sold or appraised shop tools before. Miller gave the following valuations:

| ITEM | MILLER'S APPRAISAL |
|---|---|
| 1 Arco welder | $ 50.00 |
| 1 Craftsmen drill press | 175.00 |
| 1 hydro pressure gun | 200.00 |
| 1 Forney welder | 125.00 |
| 1 steam cleaner | 200.00 |
| 1 analyzer, scope, and chest | 250.00 |
| Snap-On tools | not stated |

The debtors' proposed findings of fact indicate that Swenson claims the first three items and Weinbrenner claims the latter three items. They presented no evidence on the value of the Snap-On tools; they have treated the Snap-On tools as a residual category. PCA relied upon the debtors' loan applications dated March 23, 1981 and June 8, 1981 in which they placed an aggregate value of $11,000.00 on their tools and equipment exclusive of the Arco welder. Weinbrenner argues that PCA had simply carried over that value from an earlier loan application and that he did not affirmatively claim that the tools were worth $11,000.00 on those dates. While PCA presented no independent evidence of the current value of the tools and equipment its proposed findings of fact value the Snap-On tools at $5,000.00.

PCA claims that it has a purchase money security interest ("PMSI") in the corn planter, hay bailer, mower-conditioner, and elevator listed by Weinbrenner and the wagons (two), and the gravity boxes (two of four) listed by Swenson. PCA bases its claim of purchase money status on loan applications dated January 5, 1979 and October 17, 1979 which indicate that one of the purposes of the January 5, 1979 loan was to refinance the debtors' obligation to Farmers International for the corn planter.

The following table summarizes PCA's PMSI claims:

| ITEM | PCA DISBURSEMENT RECORD AMOUNT | DISBURSEMENT DATE | SALE DATE | SALE PRICE | SELLER |
|---|---|---|---|---|---|
| corn planter | 4,266.65 | 1/5/79 | 1/5/79 | 2,600.00 | Farmers Int. |
| hay bailer/ejector | none[3] | — | 1/5/79 | | Mt. Horeb Imp |
| mower-conditioner | 11,669.00 | 1/5/79 | 1/5/79 | 10,600.00 | Mt. Horeb Imp |
| elevator | 2,250.00 | 1/5/79 | 1/5/79 | 2,250.00 | Kalscheur Imp |
| two wagons | none[4] | | | | |
| two gravity boxes | 2,758.00 | 10/17/79 | 10/10/?[5] | 1,180.00 | Farmers Int. |

PCA does not claim a PMSI in the McFarlane four section drag claimed by Weinbrenner, nor does it claim a PMSI in the John Deere 1040 tractor, two of four J & M gravity boxes, the New Holland side rake, or the three wood thrower boxes

3. PCA's disbursement record does not specifically allocate any amount for the purchase of a hay bailer. (PCA exhibit 1f).

4. PCA exhibit number 15 includes two invoices for the sale of ten ton kory wagons on August 27, 1979 and October 16, 1979. Weinbrenner testified that he never saw these documents before. Since Swenson claims two New Holland wagons as exempt, PCA's evidence on this point is irrelevant. No evidence was introduced as to when the New Holland wagons were purchased. Two New Holland wagons were listed as collateral in the first PCA security agreement dated January 5, 1979 (PCA exhibit number 1C2). There was no evidence that the wagons claimed as exempt are different than the New Holland wagons listed on the first security agreement.

5. Weinbrenner admitted to the purchase of two J & M gravity boxes in October of 1979. PCA exhibit number 14 shows a sale receipt marked "PT. pay ch number 274" with an illegible date.

claimed by Swenson. PCA also does not claim a PMSI in any of the shop equipment or tools of the debtors.

Swenson and Weinbrenner each testified that they were in possession of all the equipment at the time proceeds of PCA's loans were disbursed. Weinbrenner testified that they used the funds obtained from PCA to pay off the balance of leases under which they acquired the corn planter and elevator. Both debtors admitted to using the PCA money to pay off what was owed on the hay bailer/ejector and mower-conditioner. However, the debtors provided no evidence of agreements with implement dealers or other parties to provide financing for the purchase of equipment. The only extrinsic evidence of their contentions that PCA was not a purchase money lender is an invoice for the sale of an IHC corn planter which clearly shows "credit for lease payments $2,400.00." (PCA exhibit number 13).

The original PCA loan giving rise to four of the claimed PMSI's was a cross-collateralized loan which supplied the bulk of the debtors' total financing needs. The loan of 1/5/79 was to be paid off over four and one half years. Additional sums, not contemplated at the time of the original loan, were advanced to the debtors for various purposes including crop financing in 1979. In total, five promissory notes were signed by the debtors that year. Interest and annual credit life insurance premiums were added to the debtors' account balance. No regular payments were expected on any of the loans. PCA did not apply payments made by the debtors to any specific note; payments simply reduced the account total.

There were a significant number of PCA disbursements and debtors' payments during the one and one-half year period prior to the consolidation and refinancing in June, 1981. The following table summarizes these transactions:

| DATE | NOTE | DISBURSEMENT | PAYMENT |
|---|---|---|---|
| 1/5/79 | 1 | 20,099.25 [6] | |
| 1/5/79 | 1 | 18,899.71 | |
| 1/11/79 | 1 | 1,299.91 | |
| 1/11/79 | 1 | 2,100.91 | |
| 1/17/79 | 1 | 1.50 | |
| 1/30/79 | — | | 150.00 |
| 2/1/79 | 2 | 520.80 | |
| 4/2/79 | — | — | 150.00 |
| 4/3/79 | | | 4,071.25 |
| 4/27/79 | 3 | 24,675.00 | |
| 5/14/79 | — | | 150.00 |
| 6/7/79 | 3 | 2,119.25 | 150.00 |
| 9/18/79 | 3 | 1,276.00 | |
| 9/20/79 | 3 | 453.00 | |
| 10/17/79 | 3 | 5,258.00 [7] | |
| 10/19/79 | 3 | 524.00 | |
| 11/21/79 | 4 | 5,600.00 | |
| 12/11/79 | ? | 950.00 | |
| 12/31/79 | 5 | 8,000.00 | |
| 1/2/80 | | | 2,500.00 |
| 2/13/80 | ? | 520.80 | |
| 3/3/80 | | | 4,100.00 |
| 4/25/80 | | | 4,726.80 |
| 5/9/80 | | | 31,794.16 |
| 5/20/80 | | | 1,200.00 |
| 10/20/80 | | | 7,186.27 |
| 12/5/80 | | | 13,000.00 |
| 2/3/81 | ? | 520.80 | |

The notes were replaced on June 8, 1981 by a "basic loan agreement." (PCA exhibit number 6). All five promissory notes were stamped "this note has been replaced by a basic loan agreement" and dated June 8, 1981. Like the earlier loans, the basic loan agreement employed a floating interest rate. An additional $520.80 charge was added to the account balance for credit life insurance. The basic loan agreement was to be paid off over a three-year period. The significant portions of the basic loan agreement follow:

2.0 *Term and Coverage.*

Unless otherwise agreed in writing: this Agreement covers all loan applications, loans, and Indebtedness pending or outstanding between the parties at the date hereof as well as any and all loans hereafter made by PCA to Borrower before this Agreement is terminated; and it amends and replaces any earlier loan

---

6. PCA claims a portion of this disbursement was used by the debtors to purchase the corn planter, hay bailer, mower-conditioner, and elevator.

7. PCA claims that two 1979 J & M gravity boxes were purchased with part of this disbursement.

agreements outstanding between the parties so that no further reference to any such earlier agreement is necessary. Until superceded, terminated, or released in writing, all previously dated but presently existing security agreements, financing statements, guaranties, mortgages, assignments, and similar security documents shall be considered as having been given pursuant to Section 5.0 hereof and shall remain in full force and effect hereunder....

7.3 *Interpretation.*

Except as specifically otherwise provided in Section 2.0, the entire agreement of the parties is in this Agreement document, in the SUPPLEMENTARY LOAN AGREEMENT(S) executed pursuant hereto, and in any security agreements, mortgages, guaranties, and similar security documents given with reference to loans covered hereby. Such written documents shall supercede all previous verbal or written negotiations, representations, promises, agreements, and communications between the parties....

■ The first question raised in this dispute is whether the debtors may claim exemptions under section 522(d)(6) for tools used in more than one trade. Section 522(d)(6) provides an exception for: "[t]he debtor's aggregate interest, not to exceed $750 in value, in any implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor." Rule of Construction 1 U.S.C. § 102(7) states "the singular includes the plural." No Code section specifies that a debtor engaged in a trade receive a certain percentage of income from the trade which is the basis of the exception. Similarly, no Code section specifies that a debtor engaged in a trade devote a certain percentage of time to the trade. The sole criterion is whether the debtor can be said, on balance, to be using the designated tools in a bona fide trade.

The legislative history does not address the issue and may be read as supporting either view. The commission report, 93rd Congress (1973), states:

The commission recommends that kinds of property that traditionally have been treated as exempt by state governments form the nucleus of the federal exemptions with appropriate federal maximums. This approach avoids the unfairness of existing state exemption laws, most of which are archaic, some of which are unduly generous, and some of which are exceedingly niggardly....

If the debtor has no home or his home has a value less than the maximum allowed, an individual debtor is allowed as exempt livestock, wearing apparel, jewelry, household furnishings, tools of the trade or the profession, motor vehicles, a burial plot, cash, securities, receivables, accrued vacation pay, and income tax refunds, not exceeding the maximum value of a homestead. This alternative to the homestead is in recognition of the fact that many debtors do not acquire homes or have only a small equity.

H.R.Rep. No. 137, 93d Cong., 1st Sess. 171 (1973), *reprinted in* 2 App. *Collier on Bankruptcy* (15th ed. 1985). The House Report, Committee on the Judiciary states:

Under current law, what property is exempt is determined under State law.... The historical purpose of these exemption laws has been to protect a debtor from his creditors, to provide him with the basic necessities of life so that even if his creditors levy on all of his non-exempt property, the debtor will not be left destitute and a public charge. The purpose has not changed....

H.R. 8200 adopts the position that there is a federal interest in seeing that a debtor that goes through bankruptcy comes out with adequate possessions to begin his fresh start.... Thus, the bill continues to recognize the States' interest in regulating credit within the States, but enunciates a bankruptcy policy favoring a fresh start. H.R.Rep. No. 595, 95th Cong., 1st Sess. 126 (1977), *reprinted in* 2 App. *Collier on Bankruptcy* (15th ed. 1985), U.S.Code Cong. & Admin. News 1978, 5787, 6087.

No decisions have been reported to date on the construction of section 522(d)(6) with respect to multiple trades. Cases construing state exemption laws split on the issue, with a majority favoring a single trade or business. *See In Re Samuel*, 36 B.R. 312 (Bankr.E.D.Va.1984) and *Bevitt v. Crandall*, 19 Wis. 610 (1865). *See also In Re Robinson*, 30 Am.Bkr.Rep. 686 (N.D.Idaho 1913). Most state exemption statutes, however, are structured differently from the federal statute.

Since section 522(d) does not differentiate between debtors on the basis of trade or occupation, the multiple trade concern reflected in *Samuel* and *Bevitt* is not present. Section 522(d) limits debtors to $750.00 in value of tools of the trade unless the section 522(d)(5) "wild card" exemption is utilized by a debtor without a homestead. Present employment practices make multiple employers, jobs, and even "trades" a commonplace and for many an economic necessity to an extent not contemplated at the times when *Bevitt* and *Robinson* were decided. Accordingly, allowing a debtor to claim tools of a trade for every bona fide trade in which he proves both intent and ability to engage is the best approach to ensure equal treatment of debtors.

██ Swenson and Weinbrenner presented uncontroverted evidence that they have engaged in both trades and intend to engage in both trades. It is fair to conclude that they have demonstrated reasonable prospects for reengaging in both farming and machinery repair if they can maintain control of certain essential items of equipment. It would indeed be a presumptuous act for a court to select one of two trades for a debtor where it appears that the debtor will not be able to retain sufficient property to continue to engage in both.

██ "Trade" is not defined by the Bankruptcy Code. Undefined terms should be given their plain and ordinary meaning in the absence of judicial construction to the contrary. The plain meaning of "trade" is "an occupation, especially one requiring skilled labor." American Heritage Dictionary 1284 (2nd Coll.Ed.1982). Since farming is an occupation requiring skilled labor, commonly employing specialized implements and tools, farming should be regarded as a trade for the purposes of section 522(d)(6), section 522(f)(2)(B), and for purposes of the Code generally.[8] The overwhelming weight of judicial opinion is in accord. *See Augustine v. U.S.*, 675 F.2d 582 (3rd Cir.1982); *In Re Decker*, 34 B.R. 640 (Bankr.N.D.Ind.1983); *In Re Currie*, 34 B.R. 745 (D.Kan.1983); *In Re Yoder*, 32 B.R. 777 (Bankr.W.D.Pa.1983); *In Re Holman*, 26 B.R. 110 (Bankr.M.D.Tenn.1983); *In Re Liming*, 22 B.R. 740 (Bankr.W.D. Okla.1982).

We thus reach the question of whether PCA's liens in the property claimed as exempt may be avoided. The power of lien avoidance under section 522(f) is a power invested in the debtor. Section 522(f) provides:

(f) Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—

. . . .

(2) a nonpossessory, nonpurchase-money security interest in any—

. . . .

(B) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor; . . .[9]

---

**8.** Since the debtors generated approximately 85% of their combined income from farming, the court need not address the question of whether one who claims farming as a trade for purposes of section 522(f)(2)(B) must satisfy the gross income test of section 101(17).

**9.** The debtor may avoid liens pursuant to section 522(f) on all categories of property subject to exemption under section 522(d), including property falling under the "wild card exemption" of section 522(d)(5). *In Re Hollinsed*, 54 B.R. 155 (Bankr.W.D.Wis.1984); *In Re Hable*, 55 B.R. 5 (Bankr.W.D.Wis.1984); *In Re Kurszewski*, 41 B.R. 604 (Bankr.W.D.Wis.1984). *Cf. In Re Sweeney*, 7 B.R. 814, 819 (Bankr.E.D.Wis.1980)

The "may avoid" language of section 522(f) parallels the language of sections 544(b) and 547(b) which grant the trustee certain avoidance powers. Under those sections, the trustee generally has the burden of proving every element necessary to set aside a targeted transaction. *See In Re O.P.M. Leasing Services, Inc.,* 40 B.R. 380 (Bankr.S.D.N.Y.1984); *In Re Flooring Concepts, Inc.,* 37 B.R. 957 (Bankr.App. 9th Cir.1984).

■ Without clear statutory authority the debtor should not be granted more power than the trustee in analogous lien avoidance situations. Thus, the debtor must bear the burden of persuasion on all elements necessary to avoid a lien under section 522(f). In an adversary proceeding to consider section 522(f) lien avoidance, the court in *In Re Clark,* 11 B.R. 828 (Bankr.W.D.Pa.1981) concluded:

> Therefore, in order to obtain the requested relief, the debtors have the burden of demonstrating that: 1) they have exemptions which have been granted; 2) that the lien being avoided is a judicial lien or nonpurchase money security interest; 3) that such lien or interest impairs the above exemptions and therefore 4) as a matter of law they are entitled to have such liens or interests avoided under § 522(f). *In Re Butler,* 5 B.R. 360, 6 B.C.D. 768, 769 (Bkrtcy, D.Md.1980).

11 B.R. at 831. Since Bankruptcy Rule 4003(d) now requires that a court hear a debtor's section 522(f) motion as a contested matter under Rule 9014 rather than as an adversary proceeding, there is a question as to whether the debtor's burden has changed. At least one recent case placed the burden of proof on the debtors in a Rule 4003(d) contested matter. The court in *In Re Weinstein,* 44 B.R. 987, 988 (Bankr.E.D.Pa.1984), found that in order to prevail on a section 522(f)(2)(B) motion the debtor had to establish that the creditor's lien was a nonpossessory, nonpurchase money security interest and that the property qualified as a tool of the debtor's trade.

Initially a determination must be made as to whether PCA ever had a PMSI in the subject implements and only then must the question of the continued existence of such an interest be addressed. In the present case, the debtors showed that PCA held a security interest in all of their shop tools and farm implements, which they would need to set aside in order to utilize the tool of trade exemptions under section 522(d). Both debtors testified that the farm implement items in which PCA claims PMSI's were in their possession on the dates that PCA disbursed money to them. The debtors stated that they sought money from PCA to "pay off" the various implement dealers. The debtors further implied that no money was ever sought from PCA to finance the New Holland wagons. Additionally, the debtors testified that leases or other sales arrangements with implement dealers existed on the corn planter, hay baler, mower-conditioner, and elevator. However the debtors did not show that they had title or equity in those farm implements on the dates they received PCA money. In addition they failed to introduce any corroborating testimony or extrinsic evidence on the existence or nature of the leases or sales contracts with the implement vendors.

With the exception of the New Holland wagons and the corn planter, PCA introduced evidence of intent to enable the debtors to acquire each implement in which it claims a PMSI. PCA also showed that the debtors made substantial payments on the corn planter, hay baler, mower-conditioner, and elevator on the date that PCA disbursed money to the debtors. PCA introduced the only extrinsic evidence of a lease, an invoice for the sale of a corn planter.

("[W]e do not believe that Congress intended that the so-called wild card exemptions of § 522(d)(1) and (5) should be subject to the lien avoidance provisions of § 522(f).") I note that *Sweeney* was cited in the district court opinion *In Re Nowak,* 48 B.R. 290 (W.D.Wis.1984), but only as authority for the district court's holding that an automobile cannot be considered a "tool of the trade" for the purpose of permitting a debtor to avoid a lien under section 522(f)(2)(A–C).

PCA also introduced evidence that the debtors made a partial payment on the two gravity boxes prior to the PCA disbursement in October of 1979.

The implements fall into three categories. As to the first, consisting of the hay baler, mower-conditioner, elevator, and gravity boxes, the debtors have not presented the court with proof that purchase money security interests did not arise. As to the second, the court may infer that the corn planter lease was of a nature that prevented PCA from acquiring a PMSI. That inference is consistent with farm machinery financing practices familiar to the court. As to the third group of implements, consisting of the New Holland wagons, the court finds that the debtors met their burden since PCA did not introduce relevant evidence to refute the debtors' testimony.

Looking then at whether PCA's PMSI's continued to the date of the debtors' filing in bankruptcy it should be noted that this court has recognized the problem of consolidating purchase money security interest with non-PMSI's. In *In Re Luczak*, 16 B.R. 743 (Bankr.W.D.Wis.1982), this court held that where a $3,000.00 loan balance was combined with a $600.00 purchase money loan on a household item, the purchase-money character of the latter loan was destroyed. A central concern was the "impossibility of apportioning the payments which have been made among the various purchase prices of the collateral. Thus, it is impossible for a debtor to know when the purchase price of any given item has been paid." 16 B.R. at 745.

In the context of cross-collateralized loans, consolidation of a purchase money loan with nonpurchase money loans takes place instantly. In the present case, the lender issued two checks on January 5, 1979. One check in the amount of $20,-099.25 issued to the debtors, was designated the source of payment for the corn planter, elevator, mower-conditioner, and one non-purchase money use. A second check in the amount of $18,889.71 was issued to the Black Earth State Bank for the account of the debtors. Thus, on the first day of the loan agreement PCA's purchase money loans were comingled with non-purchase money loans. No means of apportionment among the co-mingled collateral is suggested by the security agreements or loan documents.

Other courts have gone so far as to employ the "transformation rule"[10] which states that a lender gives up his purchase money loan when it consolidates a purchase money loan with a non-purchase money loan. Most courts have employed it reluctantly, as did the court in *In Re Coomer*, 8 B.R. 351 (Bankr.E.D.Tenn.1980), which stated "[f]urthermore, the administration of bankruptcy cases demands a workable and clear rule. Without some guidelines, legislative or contractual, the court should not be required to distill from a mass of transactions the extent to which a security interest is purchase money. 8 B.R. at 355. The court in *In Re Gayhart*, 33 B.R. 699 (Bankr.N.D.Ill.1983), expressed similar sentiments:

> Although this Court is not prepared to completely reject the Transformation Rule, under all circumstances, it is clear that a strict application of this rule in every case would work unintended and inequitable results.... It seems ironic that a strict application of the Transformation Rule would result in an act in the nature of a favor by the creditor costing that creditor his purchase-money security interest in his collateral.

33 B.R. at 700–01.

However, a partial solution to the transformation rule problem is the creation of a judicial rule to apportion principal payments on a loan balance in the absence of direction or agreement by the parties. The court in *In Re Conn*, 16 B.R. 454 (Bankr.W.D.Ky.1982), clearly believed it possessed the equitable power to prescribe a first-in, first-out allocation method:

**10.** At least one court has said that the transformation rule does not apply in business or commercial contexts. *In Re Mid-Atlantic Flange Co., Inc.,* 5 B.C.D. 693 (Bankr.E.D.Pa.1979).

What some courts have concluded can be accomplished only by contract or statute, despite the complications that might obtain, can just as easily be accomplished by court order. The task of dividing a secured debt into purchase money and nonpurchase money portions is not so burdensome that a court cannot apply its own formula in the absence of a contractual or statutory apportionment method. We believe that one of the simplest and most direct methods of allocating payments to secured items is the first-in, first-out method. Under this method, the extent to which a security interest is purchase money is determined by applying payments to the price of items in the order in which those items were purchased. This is the method White and Summers recommend secured creditors use in multiple financing contracts, and is also the method adopted in the Uniform Consumer Credit Code for consolidation of consumer credit sales.

Use of this method facilitates fairness and certainty of result to both the debtor and the secured creditor. It provides an easily applied rule of thumb—for purposes of purchase money status, what is bought first is paid off first.

16 B.R. at 458–59 (footnotes omitted). The court in *In Re Gibson*, 16 B.R. 257 (Bankr. D.Kan.1981), reached the same conclusion independently. *See also In Re Sprague*, 29 B.R. 711 (Bankr.M.D.Pa.1983); *In Re Russell*, 29 B.R. 270 (Bankr.W.D.Okla. 1983).

Both the Wisconsin courts and the Seventh Circuit Court of Appeals agree that a court sitting in equity may apply payments made on the principal sum where the parties failed to direct the application. In *Moser Paper Co. v. North Shore Pub. Co.*, 83 Wis.2d 852, 266 N.W.2d 411 (1978) the court stated, "[i]f neither the creditor nor the debtor applies the payment, then the court makes the application in accordance with equitable principles." 83 Wis.2d at 858, 266 N.W.2d 411 (citing *Theiler v. Consolidated Indemnity & Ins. Co.*, 213 Wis. 171, 250 N.W. 433 (1933)). *See also Luk-*

*sus v. United Pacific Insurance Co.*, 452 F.2d 207, 209 (7th Cir.1971).

In the present case the first-in-first-out rule would cause the court to apply all principal payments made by the debtors to first reduce the initial $38,988.96 balance owing on the debtor's account as of January 5, 1979. Without working through each principal payment, it is sufficient to note that the loan balance peaked at $97,-509.89 on or about 12/31/79 and was paid down to $43,550.00 by the June 6, 1981 refinancing. The difference of $58,000.00, even allowing for interest and forced purchases and retirements of PCA stock, clearly indicates that the entire obligation existing on January 5, 1979 was extinguished prior to the refinancing. Thus, if payments are allocated to the purchase of the first items of collateral acquired, any PMSI PCA had in the disputed items has long since been extinguished.

It is suggested, however, that in the absence of a novation PCA should be able to retain the purchase money character of its security interest until the entire balance has been paid. Support is found from a statement of this court in which allocation of payments was not an issue. A refinancing agreement between the original parties to a purchase money security agreement was said to destroy the purchase money nature of the relationship only if a novation occurs. *In Re Richardson*, 47 B.R. 113 (Bankr.W.D.Wis.1985). The latest statement on the issue of novation by Wisconsin courts is contained in *Navine v. Peltier*, 48 Wis.2d 588, 180 N.W.2d 613 (1970). In that case the court considered whether the acts of the parties, in the absence of express agreement, clearly indicated consent by the creditor to effect a novation. In affirming the lower court which found insufficient evidence of intent, the court stated:

this state is in accord with the modern position and recognizes a novation by substitution of obligations between the same parties as well as by substitution of parties.

With this established, two questions are presented. First, did the evidence clear-

ly show consent by the respondents, Navines, to a substitution of obligations between the parties and, secondly, was there sufficient consideration to support a new obligation.

48 Wis.2d at 594, 180 N.W.2d 613.

At least one court has held that any refinancing is in legal substance a novation. *In Re Slater*, 19 B.R. 954 (Bankr.D. Md.1982). *See also In Re Clark*, 9 B.R. 407 (Bankr.E.D.Va.1981). However, in the absence of a clear demonstration of the intent of the parties, most courts have looked at the substance of the questioned refinancing transaction. The *Richardson* opinion (citing *In Re Gayhart*, 33 B.R. 699, 11 B.C.D. 1353 (Bankr.N.D.Ill.1983)) and *In Re Koch*, 54 B.R. 26 (Bankr.W.D.Wis.1985), suggest that intent can never be inferred merely by examining the changes between the earlier agreement and the later refinancing agreement.

Although careful analysis of novation is not necessary to a decision in the present case it should be disposed of as a point of argument. The PCA "basic loan agreement" clearly states that it "replaces any earlier loan agreements ... so that no further reference to any such earlier agreement is necessary." The notes executed at the time the PMSI's allegedly arose were all stamped "[t]his note has been replaced by a Basic Loan Agreement." The basic loan agreement further provides that only the existing security documents continue to have effect. For all other purposes the basic loan agreement "shall supercede all previous verbal or written ... agreements and communications between the parties." In *In Re Walkington*, 42 B.R. 67 (Bankr. W.D.Mich.1984), the court held that an identical PCA basic loan agreement executed ten weeks after the loan agreement in this case met the standard of novation. The court focused on the intention of the parties to create a new debt and a new security interest which superceded earlier agreements. The court also noted that any ambiguity as to the survival of previous security agreements would be construed against the drafter of the document. Since that court apparently employed the same test of novation which the law controlling this court prescribes, its conclusions as to the construction of the PCA basic loan agreement would seem to be correct for this case as well.

If the intent to create a new obligation is established, the party which attempts to prove the novation must show a legal detriment to support the new contract. The new contract must stand on its own. 58 Am.Jur.2d *Novation* § 21 (1971), expresses this requirement as follows:

> Contracts of novation are no different from other contracts in that to be valid and enforceable they must be based on a good and sufficient consideration. The ... consideration need not be pecuniary, or even beneficial to the person promising. If it be a loss or even an inconvenience to the promisee, the relinquishment of a right ... (or) the discharge of a debt ... it is sufficient.

58 Am.Jur.2d at 535–536. Consideration in this case is supplied by the $520.80 addition to the principal balance for credit life insurance on 6/8/81 necessitated by the execution of the new agreement. The annual premium for 1981 had been previously charged to the debtor's account in February of that year.

Thus, it appears under any analysis of the PCA loan history that the PMSI which PCA had in the hay baler, mower-conditioner, elevator and gravity boxes prior to 1981 was extinguished prior to the debtor's filing in bankruptcy. Thus, to the extent that the property subject to the PCA lien is exempt the PCA liens may be avoided under section 522(f).