**In re Scott F. ZERSEN and Mary K. Zersen, Debtors.**

**Bankruptcy No. 95–50786–13.**

United States Bankruptcy Court,
Western District of Wisconsin,
Eau Claire Division.

Sept. 29, 1995.

Terrence J. Byrne, Byrne, Goyke, Olsen & Tillisch, S.C., Wausau, WI, for debtors.

William F. Greenhalgh, Greenhalgh & Hoffman, S.C., Baraboo, WI, for Baraboo Nat. Bank.

*MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW*

THOMAS S. UTSCHIG, Bankruptcy Judge.

The matter presently before the Court is the confirmation of the debtors' chapter 13 plan. The Baraboo National Bank has objected to confirmation for two reasons. First, the bank contends that the debtors have undervalued their homestead, upon which it claims assorted liens. Second, the bank objects to the plan provision which directs that the bank must apply plan payments to an obligation cosigned by Robert and Darlene Hill, who are Mrs. Zersen's parents, before applying payments to any other claims. The bank contends that it should be free to pursue the Hills upon the cosigned obligation, and that all payments made by the debtors under the plan should be applied instead to a business note executed by the debtors alone.

The Court held an extended hearing on this matter on August 16, 1995. The debtors were represented by Terrence J. Byrne, while the bank was represented by William F. Greenhalgh. Each side presented appraisal testimony concerning the value of the debtors' homestead. There was also testimony concerning the various loans made by the bank to the debtors and the collateral which was intended to secure those obligations. At the close of argument, the Court took the matter under advisement in order to more fully address the issues pertaining to the debtors' right to direct the application of plan payments and the ability of the bank to pursue its claims against the Hills. Before addressing these issues, however, the Court will first set forth the factual background of

this case, and then resolve the valuation issue which was also presented at the hearing.

## A. Factual Background

For a number of years, the debtors lived in Baraboo, Wisconsin. Scott Zersen was self-employed and operated a carpentry business. In the course of his business operations, he obtained a series of loans from the Baraboo National Bank. Ultimately, in December of 1993 these obligations were consolidated into one business note in the principal amount of $131,727.87. Prior to the execution of the business note, the debtors decided to move from Baraboo, in part due to their belief that it was no longer a safe place to raise their children. As they had vacationed in the area around Boulder Junction, Wisconsin, on several occasions and liked it, they decided to move there. They located a house that they liked for $58,500 and attempted to locate financing as well. The sellers were apparently willing to finance the bulk of the purchase price through a land contract, but the debtors needed a $20,000.00 down payment. Despite the rather modest size of the necessary loan, their requests for financing at a bank in Boulder Junction were denied for unspecified reasons.

At this point, the debtors approached Gene Higgins, their loan officer at the Baraboo National Bank, and asked for help. According to the debtors,[1] Mr. Higgins told them that he would help them get the loan for the down payment, no matter how it needed to be structured. Scott Zersen testified that at this time Mr. Higgins mentioned that they might need a cosignor for the loan. Mr. Zersen subsequently discussed the matter with his wife, who then asked her parents if they would be willing to cosign a loan. The Hills agreed to do so.

Mr. Zersen testified that after his wife obtained the Hills' promise to cosign the loan, he went back to the bank and obtained the bank's approval. According to Mr. Zersen, the arrangement with the bank was that as soon as the loan documents were complet-

ed their account would be credited with the loan amount, but in the meantime they had access to the funds so as to proceed with the closing. Prior to the closing on October 15, 1993, Mr. Zersen wrote a check to the bank and obtained an $18,500.00 cashier's check. This check, together with $1,500.00 Mrs. Zersen withdrew from her pension fund, constituted the down payment on the house. It is uncontroverted that by accepting the $18,500.00 check and providing Mr. Zersen with the cashier's check, the bank permitted the Zersens' account to become overdrawn in that amount. It is also uncontroverted that the loan documents were not executed until October 28, 1993, and the loan proceeds were deposited into the Zersens' account on October 29, 1993.

Despite acknowledging that the bank allowed the debtors' account to become overdrawn in the amount of $18,500.00 and deposited the loan proceeds directly into the debtors' account to rectify that overdraft, the bank would have the Court accept a rather different view of the loan transaction. Mr. Jicinsky, on behalf of the bank, testified that the loan was actually made to the Hills, who in turn lent the money to the Zersens for whatever purpose they desired. According to Mr. Jicinsky, the bank would not have loaned the money to the Zersens given the precarious status of their outstanding loans with the bank. Mr. Jicinsky seemed to suggest that the Zersens' names were simply added to the loan paperwork as co-borrowers as an afterthought, or at the Hills' request.

In this regard, it is true that the Hills' names appear first on the $18,500.00 mortgage note dated October 28, 1993, and that Mrs. Zersen's name is not even typed on the document, although she did sign it. The bank also submitted several other documents which tend to support its contention. On the loan information and record sheet prepared by the bank regarding the loan, Robert and Darlene Hill are listed as the borrowers, while Scott and Mary Zersen are described as the co-borrowers. The purpose for the

---

1. Mr. Higgins did not testify at the hearing. Therefore, the debtors' version of the facts surrounding his involvement in the loan transaction stands largely uncontroverted. The bank officer present at the hearing, Jeffrey Jicinsky, was the *Hills'* loan officer, and testified that he had no involvement in the preparation of the loans at issue.

loan is specified as a "personal loan for daughter." Similarly, there is a declaration of purpose relating to the loan which reflects that Robert and Darlene Hill applied for an $18,500.00 loan, labelled a "personal loan for daughter." The declaration also specifies that the primary collateral for the loan is "personal income" and the secondary collateral is an assignment of land contract, but it is not clear whose income or what assignment of land contract is involved.

Beyond these internal bank documents, however, the bank produced nothing signed by the Hills which expressly indicates that they were the primary borrowers. Neither the Hills nor the Zersens were required to fill out a credit application. The Hills apparently never received the loan proceeds they allegedly borrowed from the bank. There is also no evidence that they directed the bank to deliver those proceeds to the Zersens. In this regard, the debtors submitted a credit voucher from the bank indicating that their account had been credited with $18,500.00 in "loan proceeds," which they argue supports their theory that the loan was to them. Further, the debtors have apparently made all the payments on the loan. After examining the documents, the Court agrees that, when taken as a whole, they tend to support the theory that Mr. Higgins fulfilled his promise to get the Zersens the loan, and simply structured the paperwork to make it work. This interpretation of the facts is further bolstered by Mr. Jicinsky's testimony that, although he was the Hills' loan officer at the time, he had no involvement whatsoever in the preparation of what the bank now claims was a loan to his customers.

In any event, the story continues. On December 28, 1993, Mr. Zersen appeared at the bank and executed both the $131,727.87 business note and an assignment of land contract. He testified that he signed the business note in a conference room with a number of bank officers, while the assignment was executed in Mr. Higgins' office with Higgins alone. He contends that he was told the assignment was to secure the $18,500.00 loan, and that it had nothing to do with the business note. The bank has pointed to a notation at the bottom of the business note, under the provision "for lender clerical use only," which might refer to the assignment. Based upon this notation, the bank would have the Court discount Mr. Zersen's testimony. However, it appears unlikely that Mr. Zersen would manufacture a story about signing the documents in two different offices with two different transactions in mind. Further, the bank has offered nothing but circumstantial evidence to rebut his testimony—in essence, the bank wants the court to disregard his testimony because it would not make sense for the bank to act the way Mr. Zersen says it acted. Unfortunately, the bank has offered no concrete evidence that it really didn't act that way, and Mr. Zersen's testimony is at least credible evidence of what he believed at the time the loan documents were executed.

After the Zersens moved to Boulder Junction, they decided to purchase the three unimproved lots adjoining their home. They bought these lots on land contract in May of 1994 for a total purchase price of $6,500.00. In the meantime, the bank contacted them about executing a note to replace the October 28, 1993 mortgage note. Apparently, the Hills had made a large payment to the bank on some of their outstanding loans, and the bank accidentally applied a portion of this payment to the $18,500.00 loan. When the error was discovered, the parties decided that the best way to rectify the situation would be to simply execute a new promissory note. On June 14, 1994, a new mortgage note was executed. Thereafter, on October 14, 1994, the Zersens executed an assignment of land contract assigning their interest in the May 1994 land contract to the bank for collateral as well. In the fall of 1994, the debtors defaulted on the business note; this case was filed in the spring of 1995.

There remain significant questions and inconsistencies in the tales told by both sides. The fact that the debtor executed both the business note and the first assignment on the same day is bothersome, as is the execution of the second land contract assignment. The reason for its execution was never satisfactorily explained, except to the extent that the bank suggested that it was obtained to further bolster its poor collateral position in

connection with the business note. However, the business note itself is troublesome. Other than boilerplate language providing that it "is secured by all existing and future security agreements and mortgages," there is nothing in it which would indicate the bank intended to take collateral for the note.[2] Further, the absence of any reference in the land contract assignments to the obligations they purportedly secure is baffling, especially since the promissory notes do not coherently express an intention to take specific collateral. The Court will discuss the ramifications of the inconsistencies in the competing stories in part C of this opinion, concerning confirmation of the debtors' plan.

## B. Valuation of the Debtors' Homestead

The parties disagree on the value of the debtors' homestead. The property consists of five lots located in a subdivision in Boulder Junction, Wisconsin. Three of the lots are unimproved, while the remaining lots contain the debtors' house. Each side has submitted an independent, third party appraisal. The debtors' appraiser states that the property is worth $74,000.00, while the bank's appraiser contends that it is worth $85,000.00. It is the Court's responsibility to determine the value of the property both for confirmation and to determine the amount of the bank's secured claim.

 11 U.S.C. § 506(a) provides for valuation of secured claims, and states in pertinent part that:

[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent

that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

The phrase "value of such creditor's interest" in this subsection means "the value of the collateral." *United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). There is no clear cut formula or benchmark for valuing a creditor's collateral, and valuation depends upon the facts and evidence presented in each particular case. *In re Owens*, 120 B.R. 487 (Bankr.E.D.Ark. 1990). "Value" is not a narrow term which can be rigidly applied under the same standard in all cases for all purposes; rather, the courts are called upon to determine "value" on a case-by-case basis, in the process considering the purpose of valuation and the proposed disposition or use of the subject property. *In re Penick*, 170 B.R. 914 (Bankr.W.D.Mich.1994). The code's expansive approach to valuation allows the court latitude to look at a variety of methods for valuing the property. *Id.* at 917.

 There are three generally recognized appraisal techniques available to determine the fair market value of real property. First, there is the market or sales comparison approach, which is based upon evidence of comparable sales. Second, there is the cost or land development approach, in which actual costs of construction are reduced for depreciation. Third, there is the capitalization of income approach, which capitalizes the net future income that the property is capable of producing. *See In re Melgar Enterprises, Inc.*, 151 B.R. 34 (Bankr.E.D.N.Y.1993). In

**2.** There was considerable discussion at the hearing regarding the "box" on the business note which provides "Unless checked here, this note is NOT secured by a first mortgage or equivalent security interest on a one-to four family dwelling used as a Maker's principal place of residence." Mr. Jicinsky testified at trial that the box should have been checked if the bank intended to take a mortgage. In subsequent correspondence, Mr.

Greenhalgh contends that the box was properly not checked because the bank could not have taken a first mortgage given the prior interest of the land contract vendors. All of this simply further highlights the numerous inconsistencies and ambiguities in the bank's loan documents, the effect of which the Court discusses more fully in part C of this opinion, below.

this case, both appraisers have utilized the market comparison approach, and the Court agrees that this method is the most appropriate for this property.

■ The testimony of each appraiser was quite helpful to the Court in determining why they came to their respective conclusions. Each appraisal utilizes the value of the land itself in determining overall value. In this regard, the bank's appraiser valued the five lots at approximately $5,500.00 each while the debtors' appraiser valued them at only $4,000 each, for a total difference of approximately $7,500.00. The disparity is based largely upon the fact that the bank's appraiser placed considerable weight upon the recent sale of several interior lots in the same subdivision as the subject property, while the debtors' appraiser made adjustments to those lot sales because he believed they were more desirable than the debtors' property. The lots used as comparables are larger than the debtors' lots and are located on the interior of the subdivision, while the debtors' property is on the town road on the exterior of the subdivision. The bank's appraiser believed that market demand justified his failure to make any adjustments to the comparable sales, but the debtors' appraiser submitted that even in a seller's market lot size and location were still a factor.[3]

■ Another discrepancy involved the type of heating system in the house, and it appears that the bank's appraiser was mistaken about the presence of a gas forced air system. The actual system, an electric forced air system, adds considerably less value to the house, resulting in a difference of approximately $1,000.00 between the two appraisals. The parties also disagreed about the general condition and value of the type of home constructed on the debtors' property. The house is a manufactured or "pre-fab" house approximately 25 years old. The bank's appraiser testified that in his opinion the house was worth as much as a traditional "stick-built" home, while the debtors' appraiser contended that a manufactured home

of this vintage was generally of lesser value. This difference of opinion accounted for the remaining disparity in value.

The Court agrees with the debtors' appraiser concerning the comparative value of manufactured homes, as well as the relative value of this home given its condition. The Court also agrees that the mistake made by the bank's appraiser regarding the heating system should be discounted. However, the Court disagrees with the debtors' appraiser concerning the value of the land itself. While the Court recognizes that in general interior lots are more valuable than lots on the exterior of subdivisions, in this particular case $4,000.00 per lot seems low given the apparent demand for lots and the evidence regarding comparable sales. On the other hand, the failure of the bank's appraiser to make any adjustment to his comparables for their larger size and more desirable location precludes the Court from merely accepting his valuation of the lots. Given the foregoing discussion, the Court accepts the debtors' appraisal of $74,000.00, but modifies it to provide for an increase of $500.00 in the value of each lot, for a total increase of $2,500. The value of the debtors' homestead for purposes of determining the bank's secured claim is therefore set at $76,500.00.

### C. Confirmation of the Debtors' Plan

Confirmation of the debtors' plan seemingly hinges upon the debtors' ability to allocate payments to the cosigned obligation. The battle over this provision in the debtors' plan has caused the parties to summon the common law regarding allocation of payments, the "identical source" rule, and the doctrine of marshalling of the assets. It has also caused the bank to complain that it is being treated inequitably, and that it is being forced to give the debtors and the Hills an $18,500.00 "gift." However, the parties have not focused at any length upon what lurks behind the payment issue, and what likely fuels the bank's attacks on the debtors' plan—the co-debtor stay of 11 U.S.C. § 1301.

---

**3.** Notably, neither appraiser placed much weight upon the debtors' purchase price of $6,500.00 for three lots in May of 1994. In fact, their purchase price was discounted by the debtors' appraiser as

a "good deal." This sale also took place over a year ago, and the more recent sales of lots in the area justify a finding that this price was in fact quite low for the market.

It appears that it is the effect of the co-debtor stay that the bank is truly hoping to avoid, and the Court must accordingly set the stage for a discussion of the issues by discussing the effect of § 1301.

Section 1301(a) provides, in pertinent part, that:

> Except as provided in subsections (b) and (c) of this section, after the order for relief under this chapter, a creditor may not act, or commence or continue any civil action, to collect all or any part of a consumer debt[4] of the debtor from any individual that is liable on such debt with the debtor, or that secured such debt, unless—
>
> (1) such individual became liable on or secured such debt in the ordinary course of such individual's business; or
>
> (2) the case is closed, dismissed, or converted to a case under chapter 7 or 11 of this title.

 An issue raised in the course of this proceeding is the type of "co-debtor" protected by § 1301. Without ever mentioning § 1301,[5] the bank seemingly submits that the Hills are not "co-debtors" because the $18,500.00 loan was made to them, not the debtors. Once the Hills are defined as the "primary obligors," in the bank's estimation equity requires that they repay the loan. However, if they are "co-debtors" of the Zersens, the bank's argument suffers greatly, because under § 1301 co-debtors are protected from collection efforts by creditors to the extent that the chapter 13 plan provides for full payment of the debt. *In re Pardue*, 143 B.R. 434 (Bankr.E.D.Tex.1992). The only protection afforded the creditor is that the debtor cannot unilaterally extinguish the co-debtor's liability without full payment of the debt. *Id.* at 437. The creditor may therefore have relief from the stay to proceed against the co-debtor *only* to the extent that the plan fails to pay for a portion of the debt. *Matter of Bradley*, 705 F.2d 1409, 1413 (5th Cir.1983).[6]

The bank seems to believe that the "primary" or "secondary" nature of the nondebtor's liability determines which "co-debtors" are protected by § 1301 and entitled to benefit from the provisions of a debtor's chapter 13 plan. However, while § 1301(c)(1) provides an exception to the stay for situations in which the alleged co-debtor received the consideration for the creditor's claim, there is no other statutory basis for a distinction between levels of liability. Indeed, the Court has found only one case which arguably supports a difference in treatment based upon the "primary" nature of the nondebtor's liability, and that case appears to have been decided by a misreading of § 1301.

In *In re Kelley*, 22 B.R. 150 (Bankr. M.D.Ala.1982), the court found that the co-debtor stay did not protect a co-obligor because the debtor had not been the "primary obligor." The facts in *Kelley* were remarkably similar to the present case. The debtor contacted the creditor in hopes of obtaining a loan. He did not make an application for a loan because his discussions with the creditor indicated his credit history was unsatisfactory. The debtor then asked his mother to assist him in obtaining a loan, and the mother agreed. The mother applied for a loan from the creditor and was treated as the borrower by the creditor. In fact, it was only at her request that the son's name was added to the loan documents. The loan proceeds were made payable to both the mother

---

**4.** The bank has apparently conceded this is a "consumer debt", which is defined as one incurred primarily for a personal, household or family purpose. *See* 11 U.S.C. § 101(8). Although there has been some question as to whether an obligation secured by real property is a consumer debt, *see In re Ikeda*, 37 B.R. 193 (Bankr.D.Hawaii 1984), the better view is that a loan incurred by a debtor to purchase a family home is a consumer debt. *See Matter of Booth*, 858 F.2d 1051, 1054–55 (5th Cir.1988); *In re Johnson*, 115 B.R. 159, 162 (Bankr.E.D.Ill.1990); *In re Gunderson*, 76 B.R. 167, 169 (Bankr.D.Ore. 1987). The decision in *In re Nenninger*, 32 B.R.

624, 626 (Bankr.W.D.Wis.1983) has no impact on this decision, as the property involved in that case was a commercial campground.

**5.** The bank's attorney did refer to the co-debtor stay in closing argument, when he indicated that if the bank's objections to confirmation were sustained, it would seek relief from the stay.

**6.** Of course, if the debtor defaults under the plan, the co-debtor remains liable for the deficiency. *Bradley*, 705 F.2d at 1413.

and the son, but the parties all knew the loan was for the son.

The creditor objected to the debtor's plan and sought relief from the provisions of § 1301. Although the debtor proposed to repay the debt under his plan, the court concluded that the situation had not been contemplated by the drafters of the code, and that the mother was not a "co-debtor" within the meaning of § 1301. The court stated:

> It can only be concluded from the facts that the mother of the debtor ... is the principal and primary borrower from [the creditor] and that [the creditor] did not seek the mother as a guarantor, endorser, or surety but rather loaned her the money with the knowledge that she intended to give it over to her son. The fact that the son signed the note and received the consideration does not of itself render the mother a codebtor protected by the automatic stay provided by Section 1301 of the Code. [cite omitted]. No new liability was created as to the mother by reason of the filing of the case and the chilling effect on prospective debtors by reason of their codebtors becoming liable for their debts is not present in this case.

*Id.* at 151.

 This Court, however, must disagree with *Kelley's* analysis of § 1301(a), as that code section protects not only those parties who "secured such debt" (i.e., the guarantors, endorsers, or sureties the *Kelley* court mentioned) but also those parties who are "liable on such debt with the debtor" (i.e., co-obligors). Section 1301(a) simply makes no distinction between "primary" and "secondary" liability. The question is liability in general, and if both the debtor and co-debtor are liable, the co-debtor stay of § 1301 applies. *See In re Lopez Melendez,* 145 B.R. 740, 743 (D.Puerto Rico 1992) (section 1301 is designed to protect debtor from indirect pressure of family and friends who have cosigned obligations).[7]

Indeed, the majority of courts have recognized that the only time the co-debtor stay should be lifted are in situations in which the

debtor is actually the co-debtor in the disputed transaction. In these circumstances, § 1301(c)(1) provides the creditor with relief from the stay to the extent that the nondebtor party received the consideration for the creditor's claim. The legislative history reflects that the indirect pressures upon debtors that Congress sought to avoid simply would not be present when the nondebtor party actually received the consideration for the claim. *See* 124 Cong.Rec. H11106 (September 28, 1978); S17423 (October 6, 1978). Even under § 1301(c), however, the co-debtor stay should be lifted *only* in those situations where the debtor did not receive *any* of the consideration for the loan, as otherwise the indirect pressure to pay will still exist. *Lopez Melendez,* 145 B.R. at 743. *See also In re Motes,* 166 B.R. 147 (Bank.E.D.Mo. 1994); *In re Rhodes,* 85 B.R. 64 (Bankr. N.D.Ill.1988).

In this case, the Zersens and the Hills are clearly jointly obligated on the loan. The bank concedes this fact by asserting a claim against the Zersens for the $18,500.00 loan. The Hills did not receive any of the consideration for the loan; the debtors did. The money was deposited directly into the debtors' account. Therefore, there is no basis for finding that the debtors were actually the co-debtors. Even if the Hills were the "primary obligors," an assertion which is not borne out by the evidence, there is still no basis for precluding them from benefiting from § 1301 and the debtors' plan. The co-debtor stay protects those who are "liable on such debt with the debtor," *see* § 1301(a), and as the debtors received the loan proceeds the Hills are co-debtors within the meaning of that section. *Rhodes,* 85 B.R. at 65.

 The debtors in this case propose full payment of the $18,500.00 cosigned debt. Normally, the bank would be obligated to accept the plan payments and forebear from taking any action against the co-debtors as a result of § 1301(a). *Bradley,* 705 F.2d at 1413. However, the bank argues that it should be absolved from the impact of

---

7. Even if *Kelley* were correct in its analysis of § 1301(a), its holding would be inapplicable in this case. There is no evidence that the bank treated the Hills as the borrowers. Instead, all the evidence points to a joint obligation simply cosigned by the Hills as an accommodation.

§ 1301(a) because of the business note upon which the debtors alone are liable. The bank argues that the Hills should pay the $18,-500.00 debt and the plan payments should be allocated to the business note instead. To find in the bank's favor, the court would have to decide (i) that the debtors cannot direct the application of plan payments to benefit the Hills and (ii) that the business note is in fact secured by the debtors' home.

■ As to whether the debtors may allocate plan payments to the cosigned debt, the debtors and the bank have both cited state law in support of their arguments. The debtors contend that the "identical source" rule permits them to allocate payments. The bank argues that the doctrine of "marshalling of the assets" prohibits allocation of payments to the debt. Presupposing for the moment that the bank were secured as to the business note, however, neither party is correct. This case is simply dictated by the common law rule of payment, which is that

> [w]here a debtor owes a creditor multiple debts, a payment by the debtor should be applied to one or another of the debts as the debtor directs. [cites omitted]. Where the debtor fails to direct the application of the payment to a particular debt, the creditor may apply the payment as he chooses. [cites omitted]. If neither the creditor nor the debtor applies the payment, then the court makes the application in accordance with equitable principles.

*Moser Paper Co. v. North Shore Pub. Co.*, 83 Wis.2d 852, 857–58, 266 N.W.2d 411, 414–15 (1978); *see also Lyman Lumber of Wisconsin, Inc. v. Thompson*, 138 Wis.2d 124, 127, 405 N.W.2d 708, 710 (Wis.Ct.App.1987).

■ The "identical source" rule cited by the debtors is an exception to *Moser Paper's* general rule. Under this exception, where payment is made to a creditor who knows that the payment is derived from a particular source or fund, the creditor must apply it to the exoneration of the debt related to that source or fund, at least where the rights of third parties are concerned. *Moser Paper*, 83 Wis.2d at 858, 266 N.W.2d 411. The debtors have cited this exception in support of their position, arguing that the "equity" in their home is somehow the source of

repayment, and that this equity was the result of the loan. Under the identical property rule, however, both the loan and the payment must truly be derived from the same source, and the debtor's "equity" is not a payment source. An example of the application of this rule would be if the debtors, having used the loan proceeds to buy their house, then sold the house and paid the bank the proceeds. In that case, the bank would be required to apply the payment to the home loan, because the rights of third parties (i.e., the Hills) would be implicated. *See Sorge Ice Cream & Dairy Co. v. Wahlgren*, 28 Wis.2d 220, 137 N.W.2d 118 (1965) (where loan was used to purchase equipment guaranteed by debtor's sister, creditor was required to apply funds derived from sale of equipment to satisfy the equipment loan). In this case, the payments to the bank are not derived from the property; rather, the payments come from the debtors' paycheck, a completely unrelated source.

■ The doctrine of marshalling of the assets also does not apply. The doctrine of marshalling of the assets is an equitable doctrine, and has been described under Wisconsin law as follows:

> Where a creditor has a lien on or interest in two funds or properties in the hands of the same debtor, and another creditor has a lien on one of these funds or properties, equity at the request of the latter creditor will compel the creditor with two funds to satisfy his debt out of that fund to which the other creditor cannot resort.

*Moser Paper*, 83 Wis.2d at 860, 266 N.W.2d 411. In this case, it is quickly apparent that the necessary predicates for application of the doctrine are simply not present. Marshalling requires not only two creditors but also two distinct funds. The bank's attempt to characterize the Hills as creditors is weak at best, as is its attempt to characterize itself as two creditors in one corporate body. The Hills do not have a secured claim against the debtors; at present they have no claim at all. Additionally, there is no fund to which they have recourse that the bank does not, nor does the bank have a claim to collateral that the Hills do not. The law requires two *dis-*

*tinct* creditors, and the bank stands alone, albeit with two independent claims. Even if the bank were to be treated as two creditors, however, under *Moser Paper* it would still be without a remedy. The dispute, if any, between the bank's two claims merely involves whether one claim should proceed against the co-debtor instead of debtor. *Moser Paper* clearly states that the presence of a surety (or co-debtor) is insufficient to invoke the doctrine. *Id.* at 862, 266 N.W.2d 411.

In sum, the issue of the debtors' right to direct application of payments under the plan is controlled by the general rule that the creditor must do as the debtor directs. *Moser Paper*, 83 Wis.2d at 857–58, 266 N.W.2d 411. If a debtor may direct which debts are paid at common law, there does not appear to be any reason for holding that the bankruptcy code somehow interferes with this right. To the contrary, a similar holding was validated by the Supreme Court in the case of *United States v. Energy Resources Co.*, 495 U.S. 545, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990). In *Energy Resources*, the debtor sought to allocate payments to the I.R.S. so that the first taxes eliminated would be the "trust fund" taxes, while the general taxes would be paid later. The I.R.S. objected, arguing that the debtor should pay the general taxes first because the I.R.S. had recourse against others for the trust fund taxes. Since the debtor might default after paying the trust fund taxes and leave no one to pay the remaining taxes, the I.R.S. argued that the debtor's proposed allocation was improper. The Supreme Court rejected the argument, finding that the bankruptcy court had the authority to order the I.R.S. to apply the payments to the trust fund taxes if the bankruptcy court found that the allocation was necessary to the success of the reorganization plan. The Supreme Court stated:

> The Bankruptcy Code does not explicitly authorize the bankruptcy courts to approve reorganization plans designating tax payments as either trust fund or nontrust fund. The Code, however, grants the bankruptcy courts residual authority to approve reorganization plans including "any ... appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(5); *see also* § 1129.

The Code also states that bankruptcy courts may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Code. § 105(a). These statutory directives are consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships.

495 U.S. at 549, 110 S.Ct. at 2142, 109 L.Ed.2d at 586.

11 U.S.C. § 1322(b)(10) is identical to § 1123(b)(5), and provides that the court may approve any provision in a chapter 13 plan which is not inconsistent with the other provisions of the bankruptcy code. Clearly, there is nothing about the debtors' intent to allocate payments to the cosigned debt which is inconsistent with the code. Instead, it is contemplated by § 1301 and it is authorized by state law. Further, a similar directive was approved in *Energy Resources*. There is simply no reason to deny the debtors the right to allocate payments as they see fit within the parameters of the code and applicable state law if the allocation is necessary to effectuate the debtors' reorganization plan.

█ Regardless, even if the debtors were not entitled to allocate payments, the bank is not entitled to the relief it seeks. As the Court has indicated previously, the loan documents in this case are in disarray, completely lacking any clear indication of what the parties intended. To call the documents ambiguous may be generous, given the absence of any language which evidences that the assignments secure either the business note or the $18,500.00 note. Nonetheless, it is this Court's burden to interpret the loan documents, and given the patent ambiguities in the documents, the Court must resort to various time-honored rules of contract construction to do so. *See Capital Investments, Inc. v. Whitehall Packing Co., Inc.*, 91 Wis.2d 178, 280 N.W.2d 254 (1979) (after a contract is found to be ambiguous, the court may determine parties' intent by extrinsic evidence and canons of construction).

█ Generally speaking, the best indicator of the parties' intent is the language of the contract itself. *Matter of Alexander's*

*Estate,* 75 Wis.2d 168, 248 N.W.2d 475 (1977). In construing a written contract, the entire instrument must be considered as a whole in order to give each of its provisions the meaning intended by the parties. *Ketay v. Gorenstein,* 261 Wis. 332, 53 N.W.2d 6 (1952). In determining the parties' intent, it is appropriate to consider factors happening before and after the signing of the agreement. *H. & R. Truck Leasing Corp. v. Allen,* 26 Wis.2d 158, 131 N.W.2d 912 (1965). The omission of words may be considered in construing a contract. *Farley v. Salow,* 67 Wis.2d 393, 227 N.W.2d 76 (1975). A fundamental rule of contract construction is that in construing a contract's ambiguity the court's primary guideline should be to construe that ambiguity most strongly against the party drafting the document. *Capital Investments, supra,* 91 Wis.2d at 190, 280 N.W.2d 254; *see also Goebel v. First Federal Savings and Loan Ass'n of Racine,* 83 Wis.2d 668, 266 N.W.2d 352 (1978).

With these rules of construction in mind, the Court now turns to the loan documents. There is nothing in the business note, other than boilerplate language on the back page, which indicates that the assignment of land contract was intended as collateral for this note. The notation at the bottom is clearly not binding upon the debtors, as it was expressly for "lender clerical use only." On the other hand, the document executed to reflect the $18,500.00 loan is titled "mortgage note." The debtors both testified that they believed, and were told by Mr. Higgins, that the assignment was only intended to secure the $18,500.00 loan. There is really no evidence to the contrary. As the Court noted in part A of this opinion, it finds that the documents support their contention that Mr. Higgins simply structured the loan transaction to get the Zersens their loan. It also appears that they only intended the assignments to secure the $18,500.00 loan. Due to the numerous ambiguities in the documents the Court is constrained to construe the ambiguities against the bank and hold that the assignments secure only the $18,500.00 loan, not the business note. *Capital Investments,* 91 Wis.2d at 190, 280 N.W.2d 254.

The Court notes that it appears as if the bank, through Mr. Higgins, attempted to assist these debtors when another bank would not. For that effort it is to be commended. However, by doing so the bank took a risk, and the fact that it provided the debtors with financial assistance cannot strip the debtors of their rights under the bankruptcy code. Given the state of the loan documents, which precludes a finding that the bank is secured as to the business note, the bank's objections to confirmation are denied, and the debtors' plan is confirmed.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.